# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
January 29, 2001 Session

## MARIKA AVERY v. THOMAS EDWARD AVERY

**Appeal from the Chancery Court for Williamson County**
**No. II-25850     Russ Heldman, Chancellor**

---

### No. M2000-00889-COA-R3-CV - Filed July 11, 2001

---

In this divorce case ending a 25 year marriage, the trial court classified a bequest made solely to the husband as marital property under an "implied partnership" theory and divided the bequest equally. The parties' other property was divided, and the wife was awarded alimony *in futuro*. The husband appeals the classification and division of property and the award of alimony *in futuro*. We reverse the trial court's classification of the bequest as marital property and classify the original bequest as Husband's separate property. We find the increase in value of that separate property to be marital because of the parties' contribution to its maintenance and increase. We modify the award of marital property accordingly, modify the alimony award, and decline to award Wife attorney fees on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Reversed in Part, Affirmed as Modified and Remanded.**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

Mark Hartzog, Franklin, Tennessee, John D. Kitch, Nashville, Tennessee, for the appellant, Thomas Edward Avery.

Mary Frances Lyle, Nashville, Tennessee, for the appellee, Marika Avery.

### OPINION

Marika Avery ("Wife") and Thomas Edward Avery ("Husband") were married for 25 years and have two daughters, the older born in 1981 and the younger born in 1983. Both children were in high school at the time of the hearing, although the older daughter was expected to graduate the following spring. Mr. Avery was a 52 year old college educated stockbroker, earning an average income of more than $90,000 per year. Ms. Avery was a 48 year old graphic designer earning $31,000 per year.

The parties met in Germany while Mr. Avery was stationed there in the military. They married there in 1974 and, after Mr. Avery's discharge from service, they moved to Miami, Florida. For most of their marriage, the parties lived in Florida. They moved to Tennessee in late 1995. Mr. Avery developed his business in Tennessee while retaining business in Florida. The parties purchased a large house for $410,000. As the trial court found, the parties enjoyed a high standard of living. The court also found, "Both parties have worked hard and contributed financially to the marriage. They have lived a nice lifestyle but both have been good at managing funds and they have acquired substantial assets."

The marriage was not always satisfactory to Ms. Avery. She testified to her husband's anger and threats of violence and his difficulties with their older child. She has described Husband as demanding, controlling and threatening. In 1992, Ms. Avery told her husband she was considering a divorce. She actually filed a divorce action in 1996. The parties and their children obtained counseling for a while, and Ms. Avery dismissed her complaint. She filed this action in November of 1998.

Wife's complaint alleged as grounds irreconcilable differences and inappropriate marital conduct. Husband answered the complaint, admitted there were irreconcilable differences, but denied that he had been guilty of inappropriate marital conduct. He also counter complained for divorce alleging Wife had been guilty of inappropriate conduct. Husband also averred that he had accumulated a substantial separate estate through inheritance and requested the court to award him his separate property free from any claims by Wife.[1] Wife responded denying she was guilty of inappropriate marital conduct. She also denied that Husband had a substantial separate estate and alleged that all property owned by either party was "acquired by the joint efforts of the parties and is subject to equitable division."

Wife affirmatively agreed that the parties were unable to live together successfully as Husband and Wife. They both agreed that the parties had irreconcilable differences; however, they were unable to agree to an equitable distribution of their property or other matters. Eleven months after filing her original complaint for divorce, Wife amended her complaint to add the ground of adultery.[2] An agreed order was entered allowing this amendment.

After a six day trial, spread over several weeks, the trial court awarded a divorce to Wife on the ground of adultery. In subsequent orders, the trial court disposed of the remaining issues, including award of custody of the daughters to Wife, and an order that Husband pay $3,739 per

---

[1] In her complaint, Wife asked that Husband be restrained from transferring, removing, or dissipating the marital property or the separate property including withdrawal from the "very substantial accounts in Husband's sole name" without agreement from Wife on the basis "Husband is secretive about money and financial matters and Wife fears that she and the minor children will be irreparably harmed" without such restraint. The trial court granted the restraining order. In his answer, Husband denied there was any reason for the restraining order.

[2] In recently received responses to discovery requests, Husband had admitted to three separate one-time instances of adultery, the last having occurred after Wife filed the divorce complaint.

month in child support until the older child graduated from high school, and then pay $2,453 per month until the younger child graduated from high school. None of these holdings is appealed.

The primary issues in Husband's appeal involve the trial court's classification and distribution of the parties' property and the award to Wife of alimony *in futuro* of $500 per month until the child support terminates and $1,500 per month after that, until the death or remarriage of Wife. In addition, Wife asks for attorney fees on appeal.

We review the findings of fact by the trial court *de novo* upon the record of the trial court, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d). No such presumption is afforded to conclusions of law. *Lavin v. Jordan*, 16 S.W.3d 362, 364 (Tenn. 2000).

## I. Classification and Distribution of Property

Upon the dissolution of a marriage, courts are called upon to divide the assets the parties accumulated during the marriage. Such decisions are very fact specific, and many circumstances surrounding the property, the parties, and the marriage itself play a role. However, statute and case law provide the legal principles to which the facts must be applied. The task involves several steps, the first being to determine whether an asset is subject to division at all.

Tennessee, being a "dual property" state, recognizes two distinct classes of property: (1) "marital property," as defined in Tenn. Code Ann. § 36-4-121(b)(1); and (2) "separate property," as defined in Tenn. Code. Ann. § 36-4-121(b)(2). *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). The distinction is important because, in an action for divorce, only marital property is divided between the parties. Tenn. Code Ann. § 36-4-121(a)(1); *Brock v. Brock*, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996). Separate property is not part of the marital estate subject to division. *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995). Accordingly, when it comes to dividing a divorcing couple's property, the court should initially identify the separate property, if any, belonging to each party. *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998).

As a general statement, separate property is that which was owned by one party before the marriage or given to one party during the marriage. Tenn. Code Ann. § 36-4-121(b)(2). It includes (1) property owned by a spouse before marriage, (2) property acquired in exchange for property acquired before marriage, (3) income from and appreciation of property owned by a spouse before marriage (except in certain defined circumstances), and (4) property acquired by a spouse at any time by gift, bequest, devise, or descent. Tenn. Code Ann. § 36-4-121(b)(2).

Whether an asset is separate property or marital property is generally a question of fact. *Cutsinger*, 917 S.W.2d at 241; *Sherrill v. Sherrill*, 831 S.W.2d 293, 295 (Tenn. Ct. App. 1992). Thus, a trial court's classification decisions are entitled to great weight on appeal. *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996). These decisions will be presumed to be correct unless the evidence preponderates otherwise, *Hardin v. Hardin*, 689 S.W.2d 152, 154 (Tenn. Ct. App.

1983), or unless they are based on an error of law. *Mahaffey v. Mahaffey*, 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989).

## A. Classification of the Grundy Fund

The trial court entered a thorough and detailed order reflecting its disposition of the parties' property, and the parties have provided detailed information to us, including the statements required by Tenn. R. Ct. App. 7.[3] The trial court included a number of items in the marital estate: the couple's residence (which was ordered sold with proceeds going to Wife), two vehicles (awarded to Wife), household furnishings and other items whose distribution was agreed to by the parties, and a number of IRA, 401(k), and other investment accounts. Neither party questions the categorization of these items.

However, the correct classification of the major asset owned by the parties, or one of the parties, is the primary area of dispute in this appeal. That asset has been referred to, and will be referred to herein, as the "Grundy Fund." Of the total "marital" estate, the trial court awarded $1,854,800 (approximately 47%) to Husband and $2,094,950 (approximately 53%) to Wife.[4] These calculations, provided by the parties, reflect a total estate of approximately $3.95 million. The "Grundy Fund" had a value at trial of approximately $2.7 million. The impact of its correct classification is obvious.

Husband received the original corpus of the "Grundy Fund" in 1994 as a bequest from Mrs. Florence Grundy. In 1976, while Husband was working as a stockbroker/financial consultant, he began doing business with Mrs. Grundy who was then 82 years old. In 1984, when Mrs. Grundy was about 90 years old, she turned over management of her accounts to Husband pursuant to his offer that his firm would manage her investments at no charge except for commissions on the transactions. He also directed her to an attorney who drew up a trust instrument for her accounts which named Husband as a $50,000 beneficiary.

In 1989, Mrs. Grundy broke her hip and was hospitalized. Husband visited her in the hospital and assisted her with personal matters, since she had no relatives to help her. After Mrs. Grundy moved into a rehabilitation facility, Husband asked Wife to help her find a suitable assisted living arrangement, which Wife did. Shortly thereafter, Mrs. Grundy amended the trust to make Husband a $100,000 beneficiary and to make him the sole residual beneficiary of the trust.[5] Husband informed Wife of the change.

---

[3]This was formerly Tenn. R. Ct. App. 15.

[4]These figures, provided by the parties, also include some property awarded to Wife as separate property and a judgment awarded to Wife.

[5]Although the trust was amended after Wife began assisting Mrs. Grundy, Husband testified that Mrs. Grundy decided to amend the revocable trust before she met Wife.

Husband asked Wife to visit Mrs. Grundy and help her as needed. Wife agreed to do so, and took Mrs. Grundy to doctors' appointments, shopping, and to her women's club. The parties included Mrs. Grundy in family holiday celebrations, and Wife arranged for Mrs. Grundy to receive a birthday card from the President on her 100th birthday. Mrs. Grundy grew fond of Wife and the children; in three different years Mrs. Grundy gave each of the parties and each daughter a cash gift of $9,900 and expressed her gratitude for their friendship.

Mrs. Grundy died in 1994 at 101 years of age and Husband received more than two million dollars as a specific bequest and as residual beneficiary. Husband placed those funds in an account solely in his name, the Grundy Fund.[6]

It is clear that the Grundy Fund was left to Husband alone by Mrs. Grundy. By statute "separate property" means "property acquired by a spouse at any time by gift, bequest, devise or descent." Tenn. Code Ann. § 36-4-121(b)(2)(D). The court's authority to award property to either of the parties in this case arises from its authority to "equitably divide, distribute or assign the marital property between the parties" upon request of a party, in an action for divorce. Tenn. Code Ann. §36-4-121(a)(1). Thus, the court may only divide and distribute property which is statutorily defined as marital and may not divide and distribute property which is statutorily defined as separate.

## A. Partnership Theory

The trial court divided the Grundy Fund equally between the parties, specifically finding it to be marital property because it was acquired during the course of the marriage as "partnership property," as defined in Tenn. Code Ann. § 61-1-107(a), on the theory the parties had an implied partnership. The trial court stated:

> Clearly, an implied partnership under Bass v. Bass makes the Grundy Fund "partnership property" in accordance with law because it was acquired "on account of the partnership." T.C.A. 61-1-107(a). The fact that the Grundy Fund is "partnership property" under Tennessee law therefore disqualifies it from being controlled by the law of "separate" property under T.C.A. 36-4-121(b)(2)(D), for partnership property under these circumstances becomes "marital" property as that term is defined by T.C.A. 36-4-121(b)(1)(A).

The trial court relied on *Bass v. Bass*, 814 S.W.2d 38 (Tenn. 1991) for its finding that a partnership existed between these parties and quoted extensively from that case in its order, including the following excerpts:

---

[6]It is this fund, acquired by Husband as an inheritance, to which the parties referred in their pleadings discussed earlier.

In determining whether one is a partner, no one fact or circumstance may be pointed to as a conclusive test, but each case must be decided upon consideration of all relevant facts, actions, and conduct of the parties. . . .

Moreover, the existence of a partnership depends upon the intention of the parties, and the controlling intention in this regard is that ascertainable from the acts of the parties. Although a contract of partnership, either express or implied, is essential to the creation of partnership status, it is not essential that the parties actually intend to become partners. The existence of a partnership is not a question of the parties' undisclosed intention or even the terminology they use to describe their relationship, nor is it necessary that the parties have an understanding of the legal effect of their acts. It is the intent to do the things which constitute a partnership that determines whether individuals are partners, regardless if it is their purpose to create or avoid the relationship.

*Bass*, 814 S.W.2d at 41 (citations omitted by this court).[7]

Other language in *Bass* regarding the prerequisites of a partnership, also quoted by the trial court, presents what appears to us to be the greatest impediment to a finding that Mrs. Grundy's bequest or gift to Husband alone is partnership property.

If the parties' business brings them within the scope of a **joint business undertaking** for mutual profit--that is to say if they place their money, assets, labor, or skill **in commerce** with the understanding that profits will be shared between them--the result is a partnership whether or not the parties understood that it would be so. . .

Stated another way, the existence of a partnership may be implied from the circumstances where it appears that the individuals involved have entered into a

---

[7] The trial court made particular reference to footnote 3, which states:

"The intent of parties to form a partnership may be implied; it need not be expressed in writing or orally, if it can be derived from the parties' actions. [I]t may be asserted objectively from all the evidence and circumstances. It is not essential that the parties know that their contract, in law, creates a partnership. The legal effect of the parties' agreement, not their subjective intent, determines whether there is a partnership.

Where parties agree on all matters which, in law, constitute a contract of partnership, it will be presumed that they intend that contract, notwithstanding that the parties propose to avoid the liability otherwise attaching to partners, intend to avoid partnership, or even expressly stipulate that they are not partners. The legal effects of their relationship follow whether or not the parties foresee and intend them, and it is immaterial that the parties do not realize they are partners." 59A Am.Jur.2d, Partnership, § 152 (1987).

*Id*. n.3.

-6-

**business relationship** for profit, combining their property, labor, skill, experience, or money.

*Id.* (emphasis added by this court).

Thus, the law requires that a partnership, implied or otherwise, will only be found where the parties are jointly involved in a business undertaking. Similarly, the Uniform Partnership Act, also relied on by the trial court, defines a partnership as "an association of two (2) or more persons to carry on as coowners **a business for profit**." Tenn. Code Ann. § 61-1-105(a) (emphasis added). In *Bass*, the question before the Supreme Court was whether the plaintiff and the deceased were implied **business** partners in three separate **businesses**: a restaurant, a video machine venture, and a convenience store. *Bass*, 814 S.W.2d at 43-44. In reaching its decision, the Supreme Court itemized the plaintiff's involvement in, financial contribution to, and work at the three businesses and found, "There is no question that the Plaintiff and William Bass carried on as co-owners of a **business for profit**." *Id.* at 43.

The trial court's classification of the Grundy Fund as "partnership property" was based on its determination that the parties had worked together to maintain Husband's status as a beneficiary. The trial court stated:

Clearly, the Averys invested joint efforts into preserving Mr. Avery's beneficiary status based on an agreement which came into being as a result of Mr. Avery's invitation and with the joint anticipation and expectation that that status would not change and the marriage would benefit from the inheritance from the trust should they jointly care for Ms. Grundy in individual ways until Ms. Grundy's death.

Wife takes a similar position and argues on appeal that the business in which she and Husband were engaged was to keep Mrs. Grundy happy so she would maintain Husband as the residuary beneficiary of her trust.[8] Wife characterizes the bequest as compensation.

We cannot agree that befriending, helping, and entertaining an elderly person in anticipation of inheriting from that person is a business, a business undertaking, or a business enterprise designed to make a profit. We cannot agree that the acts of kindness performed by either of the Averys placed their efforts in commerce. We have found no authority to support Wife's assertion, or the trial court's implicit finding, that being nice to an older person in hopes of inheriting is a business enterprise. Public policy dictates against our creating such authority.

---

[8]On appeal, Wife also takes the position that it is irrelevant whether the funds were received as a result of efforts by the partnership or by Husband's efforts solely, because even if the enterprise was a sole proprietorship, the funds were compensation for services. Because Husband earned them during the marriage they fall within the definition of marital property, she asserts. We agree that the type of business entity is probably not determinative. We disagree with the overall proposition, however, because we think some business enterprise must be involved, rather than a personal bequest.

While Tennessee recognizes a cause of action for claims against an estate when one has rendered services pursuant to a contract to compensate by an inheritance, *Cobble v. McCamey*, 790 S.W.2d 279, 281 (Tenn. Ct. App. 1989), a party making such a claim must show the existence of a contract, express or implied. Otherwise,

> Where one renders services to another in the hope or expectation of a legacy, devise, or other provision by will for his benefit, without any contract, express or implied, but relying solely upon the generosity of the person for whom such services were rendered, he cannot recover for such services because of the failure of such person to make such testamentary provision in his behalf.

*Cobble*, 790 S.W.2d at 282 (quoting *Cotton v. Roberts' Estate*, 337 S.W.2d 776, 780 (Tenn. Ct. App. 1960)).

Ms. Avery has not alleged that she and/or Mr. Avery had an agreement with Mrs. Grundy that she would provide for them in her will if they would provide various services for her. Even where such a contract can be proved, the providers of the services are entitled to recover only an amount equal to the reasonable value of the services. *Cobble*, 790 S.W.2d at 282. Thus, to the extent Mr. or Ms. Avery relied upon or were able to prove a contract by which Mrs. Grundy agreed to compensate them for his or their services,[9] any recovery would be limited to the value of the services provided. Any amount over that reasonable value would be simply a gift to Mr. Avery. Ms. Avery's recourse for her absence from Mrs. Grundy's will would lie with a claim against the estate, not in an action for divorce.

The trial court, and Wife, rely on *Bass* for the additional proposition that, as the trial court stated it, "Tennessee partnership law cannot be undermined or trumped by 'the laws of domestic relations.'" The trial court relied on the following language from *Bass*:

> The fact that the parties cohabited, and were married at one point, has absolutely no bearing whatsoever in our decision today. A partnership can be implied in this case while completely ignoring the parties' social relationship. If these parties had, for example, been brothers, it is doubtful that there would have been any question raised to begin with about whether a partnership existed. As recognized by the Supreme Court of Washington in *Thornton*,[10] the ordinary laws pertaining to partnership, not the laws of domestic relations, apply in a situation such as this where a **business partnership** can be implied from the facts and circumstances, a meretricious relationship notwithstanding. The fact that the parties may be involved socially

---

[9] "[I]f plaintiffs establish that the decedent expressly or impliedly requested the services, and if plaintiffs proved that they rendered those services with the expectation that they were to be paid in some manner for those services, then a contract is made out entitling the plaintiffs to recover against the estate for the reasonable value of those services. This contract must be proven in the face of the 'Dead Man's' statute and the hearsay rule." *Cobble*, 790 S.W.2d at 282.

[10] *In re Estate of Thornton*, 499 P.2d 864 (Wash 1972).

should not, and does not, slam shut the courthouse doors to a claimant such as Linda Bass who invests time, money, labor, and energy into establishing a **profit producing enterprise**. This Court takes the view that the claimant's rights under such circumstances are predicated upon established **business partnership** doctrine, nothing more and nothing less.

814 S.W.2d at 44 (emphasis added by this court).

The *Bass* case involved a claim to one-half the assets of specific business ventures by the deceased's business partner. When Mr. Bass died intestate, Ms. Bass sought to be declared the business partner of the deceased or the equitable owner of half of the assets of his estate. *Id.* at 40. It was not a divorce case. The parties had cohabited, married briefly but divorced after a few months, and continued cohabitation, their relationship spanning a total of twelve years. *Id.* They had worked together to build several businesses. Thus, the Supreme Court's statements quoted above must the construed in context. The court simply determined that a partnership may exist in a profit making business enterprise regardless of any other relationship between the parties.

*Bass* differs from the case before this court in two very important respects. First, the Basses were actually engaged in business enterprises. Secondly, the Basses were not married or seeking a divorce, and the ownership to the business assets did not arise in the context of a divorce. In the case before us, the trial court only has authority to distribute marital property, and the applicable statute clearly defines a bequest to one party alone as that party's separate property. That statute furthers and is consistent with the well-settled rule that a testator may dispose of his or her assets freely and according to his or her own wishes. It was Mrs. Grundy's unvarying wish to leave her residuary estate to Husband alone, and she knew how to change her will and had given gifts to Wife in the past. The trial court's decision herein would have the effect of negating the testator's intent.

We conclude there is no basis in law for ignoring the statutory definition of separate property in this case, and reverse the trial court's decision to include the entirety of the Grundy Fund in the marital estate.

### B. Other Means by Which Separate Property may Become Marital Property

Tennessee recognizes other theories by which separate property is converted to marital property. Among those are the related theories of transmutation and commingling. These have been raised by Wife as alternative bases upon which the Grundy Fund should be considered marital property.

The related doctrines of transmutation and commingling have been explained as follows:

[T]wo related doctrines of commmunity property have made their appearance in the marital property cases. The first of these is commingling, according to which separate property becomes marital property if inextricably mingled with marital

property or with the separate property of the other spouse. If the separate property continues to be segregated or can be traced into its product, commingling does not occur. The second doctrine is that of transmutation. This occurs when separate property is treated in such a way as to give evidence of an intention that it become marital property. One method of causing transmutation is to purchase property with separate funds but to take title in joint tenancy. This may also be done by placing separate property in the names of both spouses. The rationale underlying both these doctrines is that dealing with property in these ways creates a rebuttable presumption of a gift to the marital estate. This presumption is based also upon the provision in many marital property statutes that property acquired during the marriage is presumed marital. The presumption can be rebutted by evidence of circumstances or communications clearly indicating an intent that the property remain separate.

2 HOMER H. CLARK, JR., LAW OF DOMESTIC RELATIONS IN THE UNITED STATES § 16.2 at 185 (2d ed.1987).

Thus, conduct between the parties can affect the classification of property. "Transmutation" occurs when the owner of separate property treats the property as marital.[11] *Batson*, 769 S.W.2d at 858. For example, if either spouse makes a gift of separate property to the marital estate, that property is transmuted into marital property. *McClellan v. McClellan*, 873 S.W.2d 350, 351 (Tenn. Ct. App. 1993); *Batson*, 769 S.W.2d at 858. Similarly, a presumption of transmutation arises when a party uses separate funds to purchase property but places the property in the names of both spouses. *Wright-Miller v. Miller*, 984 S.W.2d 936, 942 (Tenn. Ct. App. 1998); *Barnhill v. Barnhill*, 826 S.W.2d 443, 452 (Tenn. Ct. App. 1991). Transfer of title in previously separately owned property to joint ownership also creates a presumption of a gift to the marital estate. *Kincaid v. Kincaid*, 912 S.W.2d 140, 142 (Tenn. Ct. App. 1995).

Commingling otherwise separate property with marital property, or the other spouse's separate property, such that it is inextricably combined may result in transmutation of the separate property into marital property. *Hofer v. Hofer*, No. 02A01-9510-CH-00210, 1997 WL 39503 at *3 (Tenn. Ct. App. Feb. 3, 1997) (no Tenn. R. App. P. 11 application filed). Such commingling is evidence of the party's treatment of the separate property as marital. However, "if the separate property continues to be segregated or can be traced into its product, commingling does not occur." *Id.* (quoting 2 CLARK, LAW OF DOMESTIC RELATIONS § 16.2 at 185); *Pope v. Pope*, No. 88-58-II, 1988 WL 74615 at *3 (Tenn. Ct. App. July 27, 1988) (no Tenn. R. App. P. 11 application filed).

These presumptions can be rebutted with "evidence of circumstances or communications clearly indicating an intent that the property remain separate." *McClellan*, 873 S.W.2d at 351; *Batson*, 769 S.W.2d at 858. In determining whether otherwise separate property has been converted into marital property, courts will look to the intent and actions of the parties. *Id.*; *Wilson v. Moore*,

---

[11]Similarly, either spouse can give his or her interest in marital property to the other spouse, making it separate property. *Kinard v. Kinard*, 986 S.W.2d 220, 232 (Tenn. Ct. App. 1998).

929 S.W.2d at 374. In such situations, the determination of whether property is jointly or separately held depends upon the circumstances. *Langford v. Langford*, 421 S.W.2d 632, 634 (Tenn. 1967).

In the case before us, Wife claims that the Grundy Fund "was both transmuted by being treated as marital property, and commingled and thus converted into marital property." Husband deposited the Grundy Fund into a personal investment account, held solely in his name. He sometimes used money from this account to supplement the parties' income, by making deposits out of his account into the couple's joint account. Husband concedes that those funds already spent could be determined to have transmuted into marital funds. We agree with Husband, however, that the remainder of the money in his personal account, originating from the Grundy fund, was not transmuted into marital property.[12] We find no evidence of Husband's intent to gift the marital estate or Wife with the remainder of the money in his separate account, and no evidence that he commingled his separate account with jointly held property.

To the contrary, the evidence showed that Husband took great care to keep the Grundy Fund separate from the joint accounts. He specifically refused Wife's requests that the entirety of the Grundy fund be placed in a joint account.

## C. Increase in Value of Grundy Fund

After Mrs. Grundy's death, Husband received three distributions from her trust, the total value of which was $2,302,734, much of it in the form of securities. By the time of the trial the asssets, including a promissory note for repayment of a loan to Husband's brother from Grundy Fund money, had increased in value to $2,869,997. Thus, Husband's separate property had increased by $567,263 during the marriage.

Marital property is defined to include income from, and any increase in value during the marriage of separate property where "each party substantially contributed to its [the separate property's] preservation and appreciation." Tenn. Code Ann. § 36-4-121(b)(1)(B). Substantial contributions must be real and significant, but they need not be direct. *Mahaffey,* 775 S.W.2d at 623. Contributions are substantial if they enable the spouse who owned the property to retain it during the marriage. *Id.* "While the claimed contributions must be real and significant, they need not relate directly to a particular piece of separate property . . . and they need not be monetarily commensurate with the appreciation in the separate property's value." *Mahler v. Mahler*, No. 01A01-9507-CH-00303, 1997 WL 187130 (Tenn. Ct. App. Apr. 18, 1997) (no Tenn. R. App. P. 11 application filed) (citing *Mahaffey*, 775 S.W.2d at 623).

Husband asserts that the appreciation or increase in value of the Grundy Fund cannot be considered marital property because neither of the Averys contributed to it. It is true that our courts have previously held that when separate property increases in value with no contribution from either

---

[12]In addition to finding no basis for such a finding in the law, we think it would be bad policy for a court to hold that a party risks all of his or her separate property by spending some of it for the benefit of his or her family.

party, that increase remains the separate property of the owner spouse, no matter how great the other spouse's contribution to the marriage. *See Harrison v. Harrison*, 912 S.W.2d 124,127 (Tenn. 1995) (husband's separately owned land increased in value solely because an interstate highway was built across it); *Mitts v. Mitts*, 39 S.W.3d 142, 146 (Tenn. Ct. App. 2000) (increase in value of husband's stock resulted from sale of land for development, and "neither party by his or her efforts, directly or indirectly, contributed to the increase in value"); *Sherrill*, 831 S.W.2d at 295 (wife was not entitled to any portion of the increase in husband's separately owned stocks, based in part on the finding that "neither made a 'substantial contribution' to the appreciation in the value of the stock," in fact, husband's performance at the family owned corporation "very likely had a negative influence" on the value of the stock); *Crews v. Crews*, 743 S.W.2d 182, 189 (Tenn. Ct. App. 1987) (husband not entitled to any portion of increase in the value of stock when stock itself was wife's separate property and she placed unspent cash dividends in a separate bank account).

Thus, we have previously held that if separate property increases in value with no contribution from *either* party, the property remains separate. Only when one party contributes to the increase in value will courts even consider the indirect contributions of the other spouse. In the case before us, Husband, a stockbroker, managed the funds himself. Husband contends, "[T]he proof established that the increase in value came solely from the bull market of the time and the manner in which the Grundy Fund was invested, *with Mr. Avery alone handling the investments*." (emphasis added). Although Husband's contention was intended to establish Wife's lack of contribution, it shows that Husband did, in fact, contribute to the increase in the Grundy Fund's value. Unlike the increases in value in the above-cited cases where neither party was responsible for the increase, in the case before us, Husband's expertise in financial matters and his own investment decisions were responsible for the increase in value. Thus, at least one of the parties made a substantial contribution to the Fund's preservation and increase in value.

Under the circumstances, Wife's indirect contribution to the increase becomes relevant. The increase in the value of separately owned property may be classified as marital "if each party substantially contributed to its preservation and appreciation." Tenn. Code Ann. § 36-4-121(b)(1)(B) (emphasis added). A substantial contribution by the non-owner spouse "may include, but not be limited to, the direct or indirect contribution of a spouse as homemaker, wage earner, parent or family financial manager, together with such other factors as the court having jurisdiction thereof may determine." Tenn. Code Ann. § 36-4-121(b)(1)(D). The trial court herein found that Wife had worked hard and helped in the couple's management of their money; that she had worked outside the home and contributed her income to the family's expenses; and that she had performed household and child-rearing functions. Therefore, we find that Wife's continued performance of her roles of homemaker, wage earner and mother after Husband received the Grundy Fund substantially contributed to its preservation and appreciation. We find the $567,263 increase in the Grundy Fund to be marital property.[13]

_____

[13]Wife argues that the increase in value should be measured from the date of Mrs. Grundy's death, rather than from the date Husband actually received the assets because Husband managed the trust's assets during the pendency of

(continued...)

## III. Distribution of Marital Property

The trial court made findings as to the value of the property, which the parties included in their Tenn. R. Ct. App. 7 tables.[14] As noted above, the trial court included the Grundy Fund in its division of marital property. The total value of the marital property, as awarded by the trial court, was $3,915,940.[15] Of that, the trial court awarded Husband a total of $1,854,800.50, or about 47%, and awarded Wife a total of $2,061,139.50, or about 53%.

We have determined that the amount inherited by Husband as the Grundy Fund, $2,302,734,[16] is his separate property; therefore it should be removed from the total marital estate. On the other hand we have determined that the increase in the Grundy fund during the marriage, $567,263,[17] is marital property; therefore, it should remain included in the marital estate subject to distribution. With those adjustments, the total marital estate subject to distribution is $1,613,206.

Husband argues that if this court corrects the trial court's inclusion of the Grundy Fund in the marital estate, the entire division of the remaining marital property must be adjusted to provide

[13](...continued)
the estate administration. However, there is nothing in the record to indicate that Husband's role as investment manager for the trust, or the estate, gave him unfettered control. We find no basis for valuing the increase from any date other than the date upon which Husband actually received the assets of the Grundy Fund.

[14]The parties' tables reflecting the trial court's award are entirely consistent, with one exception. The trial court awarded Wife a judgment of $23,810.50, which represented half of some IRA's that Husband had liquidated during the pendency of the divorce litigation. Both parties listed this amount as an award to Wife. Wife added a similar amount to Husband's award. Because Husband's half was already included in the assets considered in the award, we choose to use the figures on the table presented by Husband for purposes of describing the amounts involved in the trial court's distribution of property.

[15]Although the parties' tables reflect a total of $3,949,750 in property distributed by the court, that figure includes $10,000 in Wife's separate property, an inheritance, and the judgment of $23,810.50 awarded to Wife. We make this adjustment to accurately reflect the total distributed by the court as marital property.

[16]This total comes from the testimony of Mrs. Grundy's lawyer who distributed the inheritance, giving Husband the residuary estate in three installments. We used the total of the three payments.

[17]The trial court found that the value of the Grundy fund at the time of trial was $2,708,411; because the final judgment making the property award was not entered for several months after the trial, the court recognized that the fund "must have fluctuated in value" and ordered the equal distribution of the fund as of entry of the final judgment. However, we interpret Tenn. Code Ann. § 36-4-121(b)(2)(B) as establishing the date of the hearing as the appropriate valuation date "unless equity would require another valuation date." The order divorcing the parties was entered only one day after the final day of the trial, and only the increase in the Grundy Fund which occurred during the marriage is marital property. Therefore, we conclude it is equitable to use the values as of the trial date. In addition, the trial court's valuation figure does not include the value of a promissory note. Husband had loaned his brother some money out of the Grundy Fund, and the brother had given him a promissory note. As of the trial, the note had an outstanding balance of $161,586. The trial court treated this note as a separate asset from the Grundy Fund, but awarded it in total to Husband as part of the distribution of the marital property. We include the amount of the note in the total value of the Grundy Fund, for ease of discussion. Thus, the total value of the fund at trial was $2,869,997.

a more equitable distribution. Otherwise, he asserts, Wife would receive approximately two-thirds of the marital property. Wife objects to the adjustments proposed by Husband. She also asserts that if she is not "otherwise awarded a substantial portion of the Grundy Fund" an award of alimony *in solido* would be appropriate.

The trial court is charged with equitably dividing, distributing, or assigning the marital property in "proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1). Thus, after the property is classified, the court is to make an equitable division of the marital property. The court is to consider several factors in its distribution, including the duration of the marriage, the contribution to and dissipation of the marital estate, and the value of the separate property. Tenn. Code Ann. § 36-4-121(c) (listing the factors to be considered).[18] The court may consider any other factors necessary in determining the equities between the parties, Tenn. Code Ann. § 36-4-121(c)(11), except that division of the marital property is to be made without regard to marital fault. Tenn. Code Ann. § 36-4-121(a)(1).

A court's distribution of property "is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case." *Batson*, 769 S.W.2d at 859. An equitable distribution is not necessarily an equal one. *Word v. Word,* 937 S.W.2d 931, 933 (Tenn. Ct. App. 1996). Thus, a division is not rendered inequitable simply because it is not precisely equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998). Similarly, equity does not require that each party receive a share of every piece of marital property. *King v. King,* 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998); *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

---

[18]Tenn. Code Ann. § 36-4-121(c) lists these factors:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

The trial court's goal in a divorce case is to divide the marital property in an essentially equitable manner, and equity in such cases is dependent on the facts of each case. The fairness of a particular division of property between two divorcing parties is judged upon its final results. *Watters v. Watters*, 959 S.W.2d 585, 591 (Tenn. Ct. App. 1997). Because dividing a marital estate is a process guided by considering all relevant factors, including those listed in Tenn. Code Ann. § 36-4-121(c), in light of the facts of a particular case, a trial court has a great deal of discretion concerning the manner in which it divides marital property. *Smith v. Smith*, 984 S.W.2d 606, 609 (Tenn. Ct. App. 1997); *Wallace v. Wallace*, 733 S.W.2d 102, 106 (Tenn. Ct. App. 1987). Appellate courts ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. § 36-4-121(c), or is not supported by a preponderance of the evidence. *Brown*, 913 S.W.2d at 168; *Wilson v. Moore*, 929 S.W.2d at 372.

We consider the factors most relevant in this case to be the length of the marriage, the contribution of each to the marriage, the earning capacity of each party, the relative ability of each for future acquisitions of capital assets and income, and the value of the separate property of each party. The parties were married for twenty five years. Nothing in the record indicates that either party entered the marriage with substantial separate assets. Both worked throughout the marriage. At the time of the divorce, Husband was earning an average salary of more than $90,000 per year, while Wife's salary was approximately $31,000. Husband's separate property, as redefined by this court, is worth $2,302,734, while Wife had separate property valued at $10,000.

We find no reason to modify the trial court's distribution of the other marital property, which appears equitable in light of the facts and circumstances of this case and the factors to be considered. Husband is not entitled to a greater share of the reduced marital estate; the removal of the Grundy Fund from the marital estate, confirming it as his separately-owned property, weighs against his receiving a greater share of the marital property rather than in favor of it.

The trial court divided the Grundy Fund equally between the parties. Similarly, we conclude that the increase in value of the fund during the marriage should also be equally divided between the parties.[19] To summarize and clarify, we affirm the trial court's distribution of marital property with regard to the proceeds from the house, the vehicles, and the various investment retirement accounts (not including the Grundy fund). In addition, each party is awarded half of the increase in the Grundy Fund during the marriage, or $283,631.50. We calculate the resulting distribution as follows:

---

[19]We specifically direct that the promissory note from Husband's brother shall be included either (1) in Husband's half of the increase in value, or (2) as part of the Grundy Fund corpus which is Husband's separate property. Because the payment on this note will be made to Husband, it should be counted as his asset, not in addition to the Grundy Fund assets, but as part of them.

|                    | To Wife                   | To Husband                |
|--------------------|---------------------------|---------------------------|
| Per Trial Court    | $706,934                  | $339,009                  |
| ½ Increase in Fund | 283,631.50                | 283,631.50                |
| Total              | $990,565.50 (about 61%)   | $622,640.50 (about 39%)   |

In addition, we affirm the judgment to Wife of $23,810.50 for one-half of the money withdrawn by Husband during the pendency of this litigation from marital accounts. We also find that the $10,000 inherited by Wife is her separate property, and the $2,302,734 inherited by Husband is his separate property.

## IV. Alimony

Thus, Wife leaves the marriage with approximately $1,025,000 in assets, and no debts. In addition to the distribution of property made by the trial court, that court also awarded Wife "the alimony she has requested, $500 per month until the child support terminates,[20] then $1,500 per month until her death or remarriage or Mr. Avery's death. . . . In fact, had she requested $1,500 per month upon entry of divorce, she would have been entitled to the same . . ." This open-ended award, without a specific duration, is an award of *alimony in futuro.*

Tennessee law recognizes three distinct types of alimony or spousal support. *Self v. Self*, 861 S.W.2d 360, 361-62 (Tenn. 1993). Alimony may be *in solido, in futuro*, or rehabilitative. Alimony *in solido* promotes the twin goals of certainty and finality though an award of a fixed amount without conditions. *Waddey v. Waddey,* 6 S.W.2d 230, 232 (Tenn. 1999); *Self*, 861 S.W.2d at 362. That fixed amount may be paid in a single lump sum payment, or it may be paid in periodic installments. *Isbell v. Isbell*, 816 S.W.2d 735, 738 (Tenn.1991). Alimony *in solido* is not modifiable even upon a showing of changed circumstances, including such events as remarriage or the increased fortunes of the recipient spouse. *Self*, 861 S.W.2d at 362; *Towner v. Towner*, 858 S.W.2d 888, 890 (Tenn. 1993); *Grissom v. Grissom*, 15 S.W.3d 474, 477 (Tenn. Ct. App. 1999). "A typical purpose of such an award would be to adjust the distribution of the parties' marital property." *Burlew v. Burlew*, 40 S.W.3d 465, 471 (Tenn. 2001).

Alimony *in futuro*, sometimes referred to as "permanent alimony" or "periodic alimony," continues support that was incident to the marital relationship and continues indefinitely. It is generally based on the need of the recipient for continued longterm support after the breakup of the marriage. Alimony *in futuro* remains subject to the control of the court, and may be modified upon a showing of a significant and material change of circumstances. *Self*, 861 S.W.2d at 361.

---

[20]The order reflects that child support ends in May of 2002, when the younger child will graduate from high school at age 18.

Rehabilitative alimony is designed to help a spouse who is economically disadvantaged, relative to the other spouse, to become financially self-sufficient. It is intended to eliminate dependency of one ex-spouse upon the other.

Tennessee statutory law regarding alimony provides:

It is the intent of the general assembly that a spouse who is economically disadvantaged, relative to the other spouse, be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance. Where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors, including those set out in this subsection, then the court may grant an order for payment of support and maintenance on a long-term basis or until the death or remarriage of the recipient except as otherwise provided in subdivision (a)(3). Rehabilitative support and maintenance is a separate class of spousal support as distinguished from alimony in solido and periodic alimony.

Tenn. Code Ann. § 36-5-101(d)(1).

Our Supreme Court has consistently interpreted this statute as the legislature's clear preference for an award of rehabilitative alimony to encourage divorced spouses to become self-sufficient. *Burlew*, 40 S.W.3d at 470-71; *Crabtree v. Crabtree*, 16 S.W.2d 356, 359 (Tenn. 2000); *Self*, 861 S.W.2d at 361.

[T]he legislature has demonstrated a preference for an award of rehabilitative alimony to rehabilitate an economically disadvantaged spouse. . . . This Court previously addressed the application of Tenn. Code Ann. § 36-5-101(d)(1) in *Self v. Self*, 861 S.W.2d 360 (Tenn.1993). In *Self*, we held that § 36-5-101 reflects an obvious legislative policy to eliminate the dependency of one ex-spouse upon the other and to relieve the parties of "impediments incident to the dissolved marriage." *Id*. at 361. Accordingly, alimony *in futuro* should be awarded only when the trial court finds that "economic rehabilitation is not feasible and long-term support is necessary." *Id*.

*Crabtree*, 16 S.W.3d at 358-59.

The trial court's findings herein included the following:

. . . It is unlikely Mrs. Avery's income will grow substantially greater than $2,583 gross, $2,000 net, per month. Mrs. Avery's expenses will drastically exceed her income when the younger child graduates. . . . Mrs. Avery's earning capacity from employment is approximately $30,000 per year. Taking into account Mr. Avery's $92,000 annual earning capacity from wages and Mrs. Avery's approximately

$30,000 earning capacity, one must conclude that Mrs. Avery cannot be rehabilitated to a level approaching the earning capacity of Husband. There is "such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors" set forth in T.C.A. 36-5-101(d)(1), including factor (d)(1)(K) [the relative fault of the parties], it being Mr. Avery's adultery which caused the demise of the marriage . . . [21]

As the trial court indicated, courts are to consider all relevant factors when deciding whether spousal support should be awarded, the nature or type of support, the amount, and the duration. Among those factors which a court is directed to consider are the following:

(A) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;
(C) The duration of the marriage;
(D) The age and mental condition of each party;
(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;
(G) The separate assets of each party, both real and personal, tangible and intangible;
(H) The provisions made with regard to the marital property as defined in § 36-4-121;
(I) The standard of living of the parties established during the marriage;
(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and
(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

---

[21] The evidence preponderates against the finding that Husband's adultery "caused the demise" of the marriage. Husband admitted to three one-time sexual encounters over the course of the marriage, one of those after Wife filed for divorce. Wife learned of the affairs during the discovery process, almost a year after she filed her complaint. While the adultery provides grounds for divorce, we cannot agree that Husband's undisclosed affairs caused the demise of a marriage which had been troubled for many years or triggered Wife's filing a complaint for divorce.

Tenn. Code Ann. § 36-5-101(d)(1).

Obviously, the beginning point in any consideration of an award of spousal support is whether one spouse is economically disadvantaged relative to the other spouse. Tenn. Code Ann. § 36-5-101(d)(1). The trial court found that Wife, with an earned income of less than $31,000, is economically disadvantaged relative to Husband who earns more than $90,000 per year. Wife was also awarded, after our determination that the Grundy Fund was not marital property, approximately $1,025,000 in assets, and assigned no debts. She received more than sixty percent of the marital property. Both parties agree that Wife was awarded substantial retirement assets, although they disagree as to the exact amount. Using the lower figure, Wife was awarded approximately $360,000 in retirement accounts. Her financial expert witness testified that this amount would have a value of over $1.5 million by the time she reached age 61.[22] Wife asserts, in her argument regarding the award of attorney fees, that her retirement accounts will grow exponentially over time because they are not taxed until funds are withdrawn.[23] Her current employment provides her with insurance and retirement benefits.

The trial court also considered Wife's age, 48, the 25-year duration of the marriage, and the parties' standard of living during the marriage. The court found that Wife was "most likely at the peak of her earning capacity."

Having determined that Wife was economically disadvantaged relative to Husband, the trial court's next task was to determine whether "rehabilitation" of Wife was feasible. As the Supreme Court has stated, alimony *in futuro* is only appropriate where "economic rehabilitation is not feasible and long term support is necessary." *Crabtree*, 16 S.W.3d at 359; *Self*, 861 S.W.2d at 361. The trial court herein made the required finding, but based it upon its conclusion that Wife was incapable of being rehabilitated to "a level approaching the earning capacity of Husband."

The question of what standard a trial court is to apply in determining whether a spouse can be rehabilitated is, to some extent, still unsettled. *See, e.g.,* JANET L. RICHARDS, RICHARDS ON TENNESSEE FAMILY LAW § 12-4(a) (Supp. 2000) (questioning whether achieving "self sufficiency," as discussed in *Loria v. Loria*, 952 S.W.2d 836, 838 (Tenn. Ct. App. 1997), meant "not qualifying for welfare" or "a comparison between the relative economic positions of the parties").

In a recent opinion, this court examined the same issue, explaining it as follows:

---

[22]Both Mr. Avery and Wife's expert testified that a 10% rate of return was both conservative and historically accurate.

[23]In addition to the retirement accounts, she acknowledges that she has other income- or growth-producing investments she will need for future support and security. It is unclear whether she was referring to the portion of the Grundy Fund awarded her by the trial court or to other funds. We have affirmed the trial court's distribution of the marital property, without the Grundy Fund, and have additionally awarded Wife half of the increase in value of the Grundy Fund. So, she is not without assets additional to her retirement accounts. The value of those assets, based on Wife's estimate of her retirement assets, is approximately $665,000.

The statute establishing the legislative preference for rehabilitative support does not define rehabilitation and gives little guidance regarding the level of rehabilitation which should be considered in determining whether rehabilitation is feasible. However, the legislature has directed that "in determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

> (B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to **improve such party's earning capacity to a reasonable level**. Tenn. Code Ann. § 36-5-101(d)(1) (emphasis added).

*Dempsey v. Dempsey*, No. M1998-00972-COA-R3-CV, 2000 WL 1006945 at *3-4 (Tenn. Ct. App. July 21, 2000) (no Tenn. R. App. P. 11 application filed). Similarly, in *Robertson v. Robertson*, No. E2000-01698-COA-R3-CV, 2000 WL 1211314 at *2-3 (Tenn. Ct. App. Aug. 25, 2000) (perm. app. granted Mar. 12, 2001), this court indicated that an appropriate factor in making the determination of whether rehabilitation is feasible is the parties' pre-divorce standard of living. The court indicated that the question should be whether the disadvantaged spouse can be rehabilitated to "a standard of living that is **reasonable** in relation to the one enjoyed by that party prior to the divorce." *Id.* at *3.[24]

In these and many other cases, our courts have made it clear that the issues surrounding spousal support are fact-intensive. In the usual case, it is simply not financially possible to create an award which will allow two people separately to continue the same, or even close to the same, standard of living they enjoyed while living together on the same income and assets. While the courts may not have arrived at a universally applicable precise definition of feasible economic

---

[24]We note that the Supreme Court defined rehabilitation in *Isbell v. Isbell*, 816 S.W.2d at 738-39, as follows:

The concept of rehabilitation in ordinary usage "involves the process of restoring an individual . . . to a useful and constructive place in society through some form of vocational . . . retraining or through relief, financial aid, or other reconstructive measure." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1949 (1961). In legal parlance and in connection with alimony, rehabilitation "contemplates sums necessary to assist a divorced person in regaining a useful and constructive role in society through vocational or therapeutic training or retraining and for the further purpose of preventing financial hardship on society or individual during the rehabilitative process." BLACK'S LAW DICTIONARY 1157 (5th ed. 1979). Both definitions contemplate the enhancement of an individual's capacity to function independently and with economic security in society. Likewise, the statute in question expresses the General Assembly's intent that the economically disadvantaged spouse be rehabilitated whenever possible and provides guidelines for the court to consider when "determining the nature, amount, length of term, and manner of payment." The concept of rehabilitation in the statute is the improvement of one's present and future capacity to function independently in society.

-20-

rehabilitation, we interpret the Supreme Court's holding in *Crabtree v. Crabtree* as eliminating salary differential between the parties as the appropriate standard.[25]

In *Crabtree*, the Court vacated an award of alimony *in futuro* made in conjunction with an award of rehabilitative alimony, finding that such a concurrent award is inconsistent. While declaring that a court must at the time of the initial setting of spousal support determine if an economically disadvantaged spouse can be rehabilitated, the Court did not address the measure a trial court is to use in making that determination. However, in reversing the intermediate appellate court's decision which expressed the concern that rehabilitative support would not place the wife "anywhere near an equal footing with Husband nor will she be able to continue living in the manner in which she had become accustomed during this twenty-three year marriage," the Supreme Court stated that its opinion in *Aaron v. Aaron*, 909 S.W.2d 408 (Tenn. 1995), relied upon the intermediate appellate court to provide "closing in money," "was intended neither to provide a new standard for awarding alimony nor to suggest that every spouse should be entitled to be placed in the same financial condition occupied prior to the divorce." *Crabtree*, 16 S.W.3d at 359-60.

In *Crabtree*, the Supreme Court found that both parties had received sufficient education to enable them to compete in the workforce; that because the wife had worked only part time after the parties had children, her earning capacity exceeded her current income; wife did not need more training, she was a CPA; and the wife received 45% of the parties' assets. Although the Court reversed the award of alimony *in futuro*, it affirmed the five-year rehabilitative alimony award, and increased the monthly amount, stating that the increase would assist wife in making the transition from part time to full time employment before her alimony was scheduled to end.

In *Crabtree*, the husband's average income for the six previous years was $340,600. The estimated income for the wife if she worked full time and charged higher fees was $65,000 to $100,000. Because the Supreme Court determined that economic rehabilitation of the wife was feasible, based on these facts, and that five years of rehabilitative alimony would ease her transition into full time employment, we conclude that the Court did not consider disparity in income or earning potential to be an appropriate standard for determining the feasibility of economic rehabilitation. Despite the disparity in the earning capacities of the parties, the Court "conclude[d] that an award of alimony *in futuro* in this case is not justified and does not recognize or further the legislative purpose of encouraging divorced spouses to become self-sufficient." 16 S.W.3d at 360.

Thus, in the case before us, we are reluctant to agree with the trial court that the fact that Husband had a much higher income and potential earning capacity at the time of divorce than Wife supports a conclusion that Wife cannot be economically rehabilitated.[26] Clearly, such a situation

---

[25]*Crabtree* was released in April 2000, a few weeks after the trial court entered its order; thus, the trial court did not have the benefit of that opinion when making its decision.

[26]We, like the Supreme Court, "recognize that a trial court has wide discretion in determining whether an award of alimony should be rehabilitative or *in futuro*." *Crabtree*, 16 S.W.3d at 360. Our conclusion that the *Crabtree* decision

(continued...)

supports a finding of economic disadvantage, but factors other than, or in addition to, current earning capacity are relevant to a person's economic self-reliance, including other assets.

The basic purpose of any award of spousal support is "to aid the disadvantaged spouse to become and remain self-sufficient and, when economic rehabilitation is not feasible, to mitigate the harsh economic realities of divorce." *Burlew*, 40 S.W.3d at 470-71 (quoting *Anderton*, 988 S.W.2d at 682). When deciding whether to award spousal support, as well as its type, duration, and amount, courts are required to consider all relevant factors, including those listed in Tenn. Code Ann. § 36-5-101(d) and set out above. However, "the real need of the spouse seeking support is the single most important factor. In addition to the need of the disadvantaged spouse, the courts most often consider the ability of the obligor spouse to provide support." *Id*. at 470 (quoting *Aaron*, 909 S.W.2d at 410, quoting *Cranford v. Cranford*, 772 S.W.2d 48, 50 (Tenn. Ct. App. 1989)); *Sannella v. Sannella*, 993 S.W.2d 73, 76 (Tenn. Ct. App. 1999). Further, the legislative preference, affirmed by our Supreme Court, is to eliminate the dependency of one spouse upon the other and to relieve the parties of impediments incident to a dissolved marriage. That can be best or most fairly accomplished by providing the assistance necessary for the disadvantaged spouse to realize his or her full economic potential, or achieve economic self-sufficiency, as quickly as the circumstances allow, so that dependency is not prolonged.

Clearly, eliminating Wife's dependency on Husband should be the court's objective. Where, as in this case, the economically advantaged spouse possesses sufficient assets to allow a relatively shorter term of dependency, we think such an award recognizes and furthers "the legislative purpose of encouraging divorced spouses to become self-sufficient." *Crabtree*, 16 S.W.3d at 360.

Husband herein does not argue that the amount of alimony ($1500 per month after May 2002) is too great; he objects to the unlimited duration. He argues that Wife has been awarded sufficient retirement funds to make her self-sufficient, in fact a millionaire, at age 59 ½, and that his alimony obligation should cease then. Wife argues that the *in futuro* alimony award is not excessive in either amount or duration. However, she asserts that if the Grundy Fund is removed from the distribution of marital property, she should receive an additional amount of alimony *in solido*.

We agree to some extent with each party. In view of the considerable assets awarded to Wife, including the retirement accounts with their estimated future value, we find no basis for continuing support beyond her reasonable retirement age. It is not unreasonable to expect her to begin using those assets saved for retirement at age 62. She would turn 62 in April of 2013. If we limit the alimony award to that date, Husband would have paid $18,000 per year for almost eleven

---

[26](...continued)
makes inapplicable the trial court's stated basis for its determination that Wife cannot be rehabilitated, however, places that determination outside the range of that discretion. *See State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn. Ct. App. 2000).

years, for a total of $195,000.[27]  In addition, Husband would have paid approximately $12,000 before the child support ended in May 2002.

Just as the Supreme Court in *Crabtree* recognized the impact of its vacating the alimony *in futuro* award and increased the monthly amount of the rehabilitative alimony award to adjust for that impact, 16 S.W.3d at 361, we are aware that our decision regarding the Grundy Fund reduces the assets available to Wife to supplement her earnings and meet her expenses without depleting assets intended for retirement.  We also recognize, however, that Wife was awarded almost two-thirds of the marital property, including proceeds from the sale of the marital home and one half the increase in value of the Grundy fund, along with no debt.  In view of all the factors courts are required to consider, including the long duration of this marriage, and in consideration of the goal of economic independence of former spouses,  we conclude that an additional award of support is warranted.[28]

We also conclude that an award of alimony *in solido*, to be paid in installments over a shorter period of time than the alimony *in futuro* award or our estimation of Wife's retirement date is the best available vehicle for achieving a fair result and promoting certainty that "benefits both parties, allowing each to make long-range financial plans for their own futures . . ." with the additional effect of fostering the legislative policy of eliminating the dependency of divorced spouses.  *Isbell*, 816 S.W.2d at 739.

Therefore, we modify the trial court's award of alimony herein and award the Wife alimony *in solido* in the amount of $457,000, to be paid as follows: 1) $125,000 lump sum to be paid within sixty (60) days of this opinion and judgment becoming final; 2) sixty (60) monthly payments of $3,450 to begin the first full month after this opinion and judgment are final, for a total of $207,000; 3) a final lump sum payment of $125,000 due within 30 days after the last of the 60 monthly payments.  Husband shall be given credit for any alimony he has paid since the entry of the trial court's final judgment.  The total amount he has so paid will be divided by twelve, and the first twelve of the sixty monthly payments shall be reduced by that amount.

## V.  Attorney Fees

Wife asks this court to award her attorney fees on appeal.  She contends that the failure to award the requested fees would cause her to deplete her resources.  Attorney fees are considered a form of alimony *in solido*, and as such, are subject to the same factors of consideration as an alimony

---

[27] June 2002 through March 2013 equals 130 months, at $1,500 per month.

[28] We are also aware that the amount of alimony awarded is largely a matter left to the discretion of the trial court, and the appellate courts will not interfere except in the case of an abuse of discretion.  *Burlew*, 40 S.W.3d at 470.  However, our other decisions regarding the marital property and the duration of alimony require our consideration of modification of the amount of the award.  Based upon the trial court's findings and other holdings, specifically that Wife, even after being awarded half the Grundy Fund, was entitled to more alimony than she requested or was awarded, we presume that the trial court, had it reached the same conclusions we did regarding the Grundy Fund, would have also increased the alimony award.

award. *Lindsey v. Lindsey*, 976 S.W.2d 175, 181 (Tenn. Ct. App. 1997). Because the assets awarded to Wife are substantial, we find that she does not have the requisite need for the additional funds and decline to award attorney fees on appeal. We do not, however, disturb the award of attorney fees made by the trial court.

## VI. Conclusion

In conclusion, we overturn the trial court's classification of the Grundy Fund as marital property under an "implied partnership" theory, and classify the original $2,302,734 as Husband's separate property. We find the increase in that separate property to be marital property because of the parties' contribution to its increase, and divide that increase equally between the parties. We affirm the remainder of the trial court's division of marital property. The award of alimony *in futuro* is modified to an award of alimony *in solido* to be paid as set out in this opinion. We decline to award Wife attorney fees on appeal. Costs of this appeal are taxed equally to both parties for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE