Claude COBBLE and Lenora Cobble,
Plaintiffs–Appellees,

v.

Vera Lee McCAMEY and Edward McCamey, Personal Representatives of the Estate of C. Elizabeth Cobble, Defendants–Appellants.

Court of Appeals of Tennessee,
Eastern Section.

Dec. 18, 1989.

Permission to Appeal Denied by
Supreme Court March 5, 1990.

Roger A. Woolsey, with Woolsey & Woolsey, Greenville, for defendants-appellants.

Kyle K. King, with King & King, Greeneville, for plaintiffs-appellees.

## OPINION

SANDERS, Presiding Judge (Eastern Section).

The Defendants, as co-executors of the will of Elizabeth Cobble, deceased, appeal from an award to the Plaintiffs for personal services rendered to the deceased during her lifetime.

Mrs. C. Elizabeth Cobble (Mrs. Cobble) died intestate in Greene County on October 7, 1985. Her will was admitted to probate and Defendants–Appellants Vera Lee McCamey and Edward McCamey (McCameys), who were named as primary beneficiaries in the will, qualified as co-executors of the will. The Plaintiffs–Appellees, Claude Cobble and Lenora Cobble (Cobbles) filed a claim against the estate in the amount of $41,729.40 for personal services rendered to Mrs. Cobble between 1972 and 1985. The McCameys filed exceptions to the claim. Upon the trial of the case it was the position of the Cobbles that prior to 1972 they entered into an agreement with Mrs. Cobble that in exchange for their taking care of her farms and assisting her as needed, she would leave them enough land and money in her will to compensate them for their services.

The proof shows Mrs. Cobble was a widow whose husband died in 1966. She had three farms in Greene County. After her husband's death a Mr. Hogan looked after the farms until 1969 when he became ill and could no longer look after them. The Cobbles were close neighbors of Mrs. Cobble's and Claude Cobble was a cousin of Mrs. Cobble's deceased husband. In June, 1969, Mrs. Cobble went to the home of the Cobbles and they had a conversation. The conversation was excluded from the evidence in the record before us but after that conversation the Cobbles began working for Mrs. Cobble. They used their own farm machinery and bushhogged her fields; they grubbed cedar bushes, built fences, cleaned out fence rows, mowed the fields, cleaned the barns. The record reveals they did just about everything that would be required to maintain the farms in good condition. The Cobbles did not tend or harvest the tobacco on the farms; Mrs. Cobble rented the tobacco allotments to other farmers. The Cobbles also looked after the personal needs of Mrs. Cobble. She had back trouble and could not stand for long periods of time. For this reason she did very little cooking and Lenora Cobble frequently took her meals to her. To further enumerate the services rendered by the Cobbles would serve only to lengthen this opinion. Numerous close neighbors of the Cobbles and Mrs. Cobble corroborated the testimony of the Cobbles and no evidence was offered to the contrary.

The Cobbles also testified they were never compensated for their services and there is no proof in the record to the contrary. There was also substantial evidence of statements made by Mrs. Cobble in her lifetime to third parties evidencing her intentions to compensate the Cobbles through her estate. The testimony of Faye C. Vanderslice, who was perhaps Mrs. Cobble's closest personal friend, removes all

doubt as to Mrs. Cobble's intention on this issue. From 1970 until about a year before Mrs. Cobble's death they were together two or three times a week and visited with each other by telephone almost daily until about a week before Mrs. Cobble's death. Mrs. Vanderslice's testimony is replete with accounts of Mrs. Cobble's telling her of the things the Cobbles did for her on almost a daily basis, how much Mrs. Cobble appreciated what the Cobbles did for her and her intention to reward them in the future. The following is a good summary of her overall testimony:

"Q. Was Mr. and Mrs. Cobble the people she [Mrs. Cobble] relied upon and depended on?

"A. That's right. She said she could always depend on them. They was always right there, and she told about how nice they kept the fields and things, and that they used their own gas and everything—cleaned up the fields, and mowed the lawn, and everything.

"Q. Now, I believe you told Mr. Woolsey that she always paid her bills, but did she tell you that she expected Mr. and Mrs. Cobble to have pay for what they'd done?

"A. She said she didn't pay them now because she was going to leave them a farm and some money so they wouldn't have to work too hard. Now, this was repeated to me not one time, it was five hundred or a thousand, or maybe two thousands if I'd kept track of it." There was also testimony of other witnesses which corroborates the testimony of Mrs. Vanderslice.

In an effort to contradict the claims of the Cobbles the Defendants offered into evidence a number of composition notebooks which contained numerous entries and notations relating to purchases, payments for labor, etc., made by Mrs. Cobble in her lifetime. The records failed to show payments to the Cobbles for any work or services during the period in issue. It was the theory and insistence of the Defendants that Mrs. Cobble was an honest person who paid her debts and since the records failed to show payments to the Cobbles, that was

proof they did not perform the services claimed. The Defendants asked that the notebooks be filed as exhibits but the chancellor sustained Plaintiffs' objection on the grounds they were hearsay and it was not shown they qualified under the Uniform Business Records Act (T.C.A. § 24–7–111).

The chancellor found the issues in favor of the Cobbles and fixed their award at $32,129.40. The McCameys have appealed, saying: (a) The chancellor was in error in denying the admission of the notebooks into evidence; (b) The evidence does not support the amount of the award; and (c) The Appellees should be estopped for failure to assert their claim in the deceased's lifetime. We find the Appellants' issues without merit and affirm the chancellor.

The chancellor filed an excellent memorandum opinion which we adopt in part as follows:

"In asserting a claim against an estate for services rendered the decedent, the cause of action necessarily is based upon either contract or quasi contract. *Nashville Breeko Block & Tile Co. v. Hopton*, [29 Tenn.App. 394], 196 SW2d 1010 (1946). To bring a contract into existence there must be an offer and an acceptance of that offer. The offer and acceptance may be expressed or implied from the parties' conduct. *Murray v. Grissim* [40 Tenn.App. 246], 290 SW2d 888 (1956).

" 'Contracts implied in fact arise under circumstances which, according to the ordinary course of dealing and common understanding of men, show a mutual intention to contract. Such an agreement may result as a legal inference from the facts and circumstances of the case. *Weatherly v. American Agricultural Chemical Co.*, 16 Tenn.App. 613, 65 SW2d 592 (Tenn.App.1933).'

" 'In order to make out an implied contract for the rendition of services, facts and circumstances must be shown which amount to a request for services, which is the offer to contract, and the performance of the requested services, which is the acceptance of the offer.' "

\*     \*     \*     \*     \*     \*

" '[A]s to services performed by a member of a family on behalf of another member of the same family, there is a presumption, which grows weaker as the relationship recedes, that the services are rendered gratuitously, from motives of affection and duty, and to entitle one in that situation to recover compensation therefor, the burden is upon them to overcome the presumption by showing either an expressed contract or such exceptional facts and circumstances as will establish an intention on the part to charge and on the other part to pay, notwithstanding the relationship of kinship. (Citing cases.)' "

\* \* \* \* \* \*

" 'Where one renders services to another in the hope or expectation of a legacy, devise, or other provision by will for his benefit, without any contract, express or implied, but relying solely upon the generosity of the person for whom such services were rendered, he cannot recover for such services because of the failure of such person to make such testamentary provision in his behalf.' Id., [*Cotton v. Roberts' Estate*, 47 Tenn.App. 277, 337 S.W.2d 776] at 780 [1960], quoting from *Brown vs. Fugua*, 9 Tenn.App. 22.

"*Cotton v. Roberts' Estate* [47 Tenn. App. 277], 337 SW2d 776 (1960).

■ "Therefore, *if* the plaintiffs establish that the decedent expressly or impliedly requested the services, *and if* plaintiffs prove that they rendered those services with the expectation that they were to be paid in some manner for those services, then a contract is made out entitling the plaintiffs to recover against the estate for the reasonable value of those services. This contract must be proven in the face of the 'Dead Man's' statute (T.C.A. 24–1–203) and the hearsay rule.

"The Plaintiffs were not so related by either blood or marriage, to the decedent that any presumption arises that the services were rendered gratuitously. Moreover, the services performed by the plaintiffs were not rendered with the mere expectation or hope that the decedent would pro-

vide for them in her will; rather, they were rendered upon the decedent's expressed promise to provide for them in her will.

"The estate proved that the decedent 'was honest and always paid her bills', the implication being that she would have paid the plaintiffs for any work that they did. However, plaintiffs' work was extraordinary and, as evidenced by the testimony of Mrs. Vanderslice, it was contemplated by everyone that decedent was going to make liberal provision in her will for the plaintiffs in return for their services.

■ "Defendants offered in evidence various composition notebooks in which the decedent apparently noted various payments made by her over the years, debts owed to her, and the like. The purpose of this evidence was to show that the decedent paid others to do certain work, even work for which the plaintiffs seek payment. Obviously, these notebooks constitute the rankest sort of hearsay—they are out of court statements offered to prove the truth of the matters asserted therein; specifically, they are offered to prove that the decedent paid certain people to do certain work. Since these documents constitute hearsay, they can be admitted in evidence only if they come within some exception to the hearsay rule. They clearly are not declarations against interest, nor are they admissions of a party, since they are neither 'admissions' nor the statements of a 'party'. The estate maintains that they are 'business records' and should be received in evidence under the Uniform Business Records as Evidence Act (T.C.A. 24–7–111). However, there must be evidence beyond the purported business record itself to prove that it is, in fact, a business record. The Act provides that

" '(c) A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness, testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event....'

"The estate proved that these notebooks were in the handwriting of the decedent.

Beyond that, the estate proved nothing except what was contained in these notebooks. The fact that the notebooks contained dates, and describes (in a rather loose fashion and almost illegibly) certain transactions and has the *appearance* of a business record, does not satisfy the explicit requirements of the act. In other words, the purported business records cannot prove themselves. The various ledgers or notebooks are clearly hearsay, have not been proven to be 'business records' within the purview of the Uniform Act, and therefore may not be received in evidence. Nevertheless, the Court reviewed the documents and considered them as if received in evidence. The Court simply cannot draw the inferences therefrom that the estate asks the Court to draw.

■ "The fact that the decedent paid other people to do certain work during the time for which plaintiffs seek payment is not conclusive of the issue; it is merely evidence to be considered along with all other evidence. The plaintiffs have proven that they rendered various services from 1972 until the decedent's death in October, 1985, in return for the decedent's promise to make provision for them in her will. The decedent breached that promise and the plaintiffs are entitled to recover for the reasonable value of the services they rendered.

"Plaintiff's claim is admittedly based on estimates of time expended; under cross-examination, it became obvious that these estimates were rather liberal and in some cases speculative. The largest portion of their claim ($17,500.00 for 'bushhogging') exceeds the reasonable value of that service. The Court believes that the claim for bushhogging is overstated; it should be reduced by $5,500.00. The claim for the years 1972 to 1979 is based largely on 'farm work' (as opposed to household work) and there has been no attempt to itemize it. However, it necessarily must be largely due to bushhogging since plaintiffs claim $2,500.00 a year for bushhogging. Therefore, this portion of the claim should be reduced in the same proportion as the other bushhogging claim. It is reduced by

$4,100.00. Accordingly, plaintiffs' claim is reduced by a total of $9,600.00. The balance of their claim ($32,129.40) is approved."

■ We concur in the chancellor's finding. We also find his memorandum opinion adequately answers Appellants' issue concerning the exclusion of the notebooks as exhibits. The notebooks were marked for identification and are in the record before us. Since the chancellor did consider the notebooks, we have also considered them. In our view, the notebooks support the contentions of the Cobbles that they were never paid for their services. The record is replete with undisputed evidence the Cobbles rendered many services for Mrs. Cobble. If we accept the notebooks for the proposition they fail to show Mrs. Cobble ever paid the Cobbles for any services, then even if the chancellor were in error it would be harmless error.

■ The Appellants' second issue is the evidence does not support the amount of the chancellor's award. It is observed the chancellor reduced the original claim of the Cobbles by approximately $10,000, leaving an award of slightly more than $32,000. When we consider this to be compensation for services rendered over a period of 13 years involving not only the Cobbles personal services but the use of their farm machinery and equipment, we find it to be very reasonable.

■ The Appellants' third contention that the Appellees are estopped to assert their claim because they did not make demand in Mrs. Cobble's lifetime is asserted for the first time on appeal. Since this issue was not raised in the trial court it cannot be raised for the first time on appeal. *See Moran v. City of Knoxville*, 600 S.W.2d 725 (Tenn.App.1979) and cases cited therein. Also, the Appellees' right of action did not accrue until Mrs. Cobble's death. *See In re Estate of McClanahan*, 63 Tenn.App. 301, 471 S.W.2d 555 (1971).

The issues are found in favor of the Appellees. The decree of the chancellor is affirmed and the cost of this appeal is taxed to the Appellants. The case is re-

manded to the trial court for the enforcement of the decree.

GODDARD and ANDERSON, JJ., concur.