# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 7, 2003

## IN RE: ESTATE OF ALTON WAYNE SADDLER, DECEASED

**Appeal from the Chancery Court for DeKalb County**
**No. 01PE48     Vernon Neal, Chancellor**

---

### No. M2003-00414-COA-R3-CV - Filed August 11, 2004

---

The niece of a decedent filed a claim against his estate, contending that she was entitled to compensation for allowing her late uncle to live rent-free for more than four years in a house that she inherited from another uncle. The trial court granted her claim. We reverse.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Betty Lou Taylor, Hartsville, Tennessee, for the appellant, Estate of Alton Wayne Saddler.

Sue N. Puckett-Jernigan, Smithville, Tennessee, for the appellee, Paula Saddler.

## OPINION

This case involves a DeKalb County house in which two brothers, Alton Wayne Saddler (Wayne) and Guy Saddler, lived together for some time. The home was owned by Guy Saddler alone. He died suddenly in 1996. Guy's other real property, a 59 acre farm, passed to his brother Wayne under the terms of his will. The house the two brothers occupied passed to his (and Wayne's) niece, Paula Saddler, the claimant herein.

After Guy's death, Wayne Saddler continued to live in the house. Paula Saddler, who lived in a Murfreesboro apartment, did not ask him for rent. Wayne paid the real estate taxes for 1996, and Paula Saddler paid the insurance and the taxes for all subsequent years. In 1997, Paula Saddler's mother died. Paula and her brothers Dwayne and Leonard became involved in a lawsuit over their mother's estate. The legal costs caused Paula's financial situation to deteriorate.

Paula Saddler never asked her uncle directly to pay her rent, but she told him when property taxes and insurance premiums became due. Wayne Saddler was aware of Paula's financial

difficulties, generally indicated to Leonard, Paula's brother, he was going to help her, but never made any payment to Paula, as rent or otherwise. When Paula and Leonard Saddler finally lost the lawsuit involving their mother's estate, Paula decided she had to sell the house, and she asked her uncle to move. He moved out in November of 2000, and she subsequently sold the property.

Wayne Saddler prepared a new will on February 26, 2001. He died on May 6, 2001, at the age of 72. His estate included $9,100 in cash, but his own 42 acre farm and the farm he had inherited from his brother Guy were its primary assets. Under his last will and testament, his entire estate went to his two grand-nephews. Dwight Saddler was named as his executor. There was no bequest for Paula Saddler.

## I. LEGAL PROCEEDINGS

Wayne Saddler's will was submitted for probate in the DeKalb County Chancery Court. Paula Saddler subsequently filed a claim against the estate for payment of 51 months of back rent at the rate of $350 per month. She reduced the total claim by a $220 credit for a water heater that Wayne Saddler had replaced at his own expense, for a net claim of $17,630.

The executor filed an exception to the claim. The grounds for the exception included the statute of limitations, the lack of a written or oral contract or lease between the decedent and the claimant, and the assertion that any benefit to the decedent was meant to be gratuitous.

The Chancellor appointed the Clerk and Master to conduct a hearing on the matter. The Master filed her decision on January 25, 2002, ruling that the lack of a written or oral contract was fatal to Ms. Saddler's claim. The Master found that Paula Saddler had allowed Wayne Saddler to continue to live in the house without requesting any financial compensation from him. The Master also noted that after Wayne Saddler moved out of the house, Paula Saddler had six months until his death in which to request payment from her uncle, to get him to sign a promissory note, or to somehow settle the question of whether he intended to pay her, but did not do so. The Master found that if Wayne Saddler had intended to pay his niece or to leave her a portion of real property "to compensate her for her kindness," he could have stated that in his new will which was prepared a few months after he moved out of the house. The Master accordingly denied the claim for rent, but allowed Ms. Saddler to collect $3,361.50 for property tax and insurance premiums she paid while her uncle lived in her house.

A brief hearing in the trial court followed. The court heard testimony from Dwight, Paula, Leonard and Carolyn Saddler (Carolyn Saddler is Leonard's wife). There was little direct contradiction as to the relevant facts.[1] There was no dispute that $350 per month would have been

---

[1]However, Paula and Leonard Saddler testified that their brother Dwight told each of them sometime in the past, before their mother died in 1997, that he had taken Wayne Saddler to a lawyer to prepare a will, that Dwight had listened outside the door, that Wayne Saddler was leaving some land to the three siblings, and that they should not pressure him about money or paying Paula. Dwight denied making any of these statements. We agree with the trial court that they

(continued...)

a fair rental price for the house, a comfortable three bedroom brick home with two bathrooms, electric heat and well water.

At the conclusion of the proof, the chancellor announced that he had tentatively decided to affirm the decision of the Clerk and Master. He noted, however, that he had prepared for the hearing on the mistaken assumption that the claimant would try to prove some sort of express contract. He accordingly declared that if she could furnish some authority that would sustain her claim on the basis of implied contract or quantum meruit, including the applicability of these theories to an estate, he was prepared to reconsider his decision.

Ms. Saddler subsequently filed a memorandum, asserting that the proof included all the elements required for a judgment in quantum meruit. The chancellor ultimately agreed. He filed a Memorandum and Order setting aside his preliminary decision and granting Ms. Saddler's claim. In its final order, the trial court explained its change of mind after reviewing post trial briefs and research. The court stated it had originally thought that Paula Saddler rested her claim on a contract implied in fact and that the proof did not establish such a contract. The court reaffirmed its conclusion that Paula Saddler had not proved a contract implied in fact.

However, the trial court stated that it had come to realize that the claim was also based on contract implied in law. The court stated:

> There is a distinct difference between a contract implied in fact and one implied in law. In order that a contract may be implied in fact, the facts and circumstances must show assent. Tennessee recognizes two distinct types of implied contracts, contracts implied in fact, and contracts implied in law, referred to as quasi contracts. A party seeking to recover on an implied in law or quasi contract theory must prove the following:
>
>> A benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, an acceptance of the benefit under circumstances that it would be inequitable for him to retain it without payment for the value thereof. (citations omitted).

The estate appeals the final order of the court upholding Paula Saddler's claim.

---

[1](...continued)
are irrelevant to the legal issues before us.

## II. The Evidence

The trial court made extensive findings of fact, the most relevant of which are:

After the death of his brother, Alton Wayne Saddler was worried about having a place to live, whereupon, Paula Sadler told him that he could continue to live in her house. . . . The claimant did not have any express agreement with Mr. Saddler which provided that he would live in the house and pay her rent. She never at any time asked her uncle Alton Wayne Saddler for rent. She did, however, express to him that she was having a lot of expenses connected with the house. He did not pay her rent or anything of value except that he did buy a water heater and paid one year's taxes . . . .

During the time that Alton Wayne Saddler was living in claimant's house, the claimant was paying rent for a place to live in the total amount of $15, 600, together with a storage building that she paid rent on in the amount of $2,763.34. The claimant was engaged in protracted and expensive litigation concerning her mother's estate. This fact was made known to Alton Wayne Saddler by claimant's brother, Leonard Saddler. Leonard Saddler testified that after being told of the considerable expenses that Paula Saddler was incurring in connection with her mother's estate, Alton Wayne Saddler told him on several occasions that he knew that Paula was paying insurance on the house, paying rent herself on an apartment, paying taxes and knew that she had all this expense and said that he was going to make it right and that this statement was made on numerous occasions by the decedent. He also testified that Alton Wayne Saddler stated that he was going to help Paula and that he was going to pay her and that he said this on several occasions.

These findings are consistent with the proof. Paula Saddler testified that she had no lease with her uncle and that she never asked him for rent. She did sometimes "suggest" to him all of the expenses she had. He never paid her rent. She did not testify that she had any agreement with her uncle or any expectation on her part that her uncle would pay rent.

In explaining how the arrangement started, Paula Saddler gave the following account of a conversation about a living arrangement for Wayne Saddler:

When Uncle Guy first passed away, he [Wayne] was real upset, because he wasn't expected to die, and the Sunday after that, Mother kept saying, you've got to talk to Wayne; you've got to talk to Wayne, because he was upset, because he said I've got to have a place to live; I don't have a place to live, I have to have a place to live.

The only real evidence of Wayne Saddler's intentions with regard to his niece is found in the testimony of Leonard Saddler, and it is the testimony relied upon by the court:

Q. ...but I want to know if you had any conversations with Mr. Wayne Saddler concerning his living in this house and whether he was to pay rent or not?

A. On many occasions, Wayne brought up that issue as I'd be over there visiting with him, and the way it was typically brought up was his concern for all the problems that we were having in trying to settle our mother's estate and all the costs that we were incurring in legal fees and so forth that he thought was just a total waste of time and unnecessary, and he said he knew it was costing both me and Paula, and I'm sure Dwight too, a lot of money, and I said, well, don't worry about it in my case, Wayne. I can pay it. I know it's a hardship on Paula, and he said, I know it, and he said, I'm gonna help her. I'm gonna pay her, and he said it on several occasions, he said, I'm gonna pay her.

He knew she was paying taxes on that house. He knew she was paying insurance on that house, and he knew she was paying rent herself on an apartment that she was renting, and he said, I know she's got all this expense and I'm going to make it right. He said that on numerous occasions.

Important to the resolution of this case are the facts that (1) there was no agreement between the claimant and the decedent that he would pay rent for staying in the house; (2) the claimant did not have an expectation, at the time the arrangement was entered into or thereafter, that the decedent would pay her rent; (3) the claimant never asked the decedent to pay rent; and (4) while the decedent may have made general statements about providing financial help to the claimant, there was no testimony that he expressly agreed to pay rent or felt he was obligated to pay rent in order to remain in the house.

### III. APPLICABLE LEGAL PRINCIPLES

A claim against an estate is based upon a debt of the decedent or the estate. As used in the statutes on estate administration, "claim" refers to "debts or demands against the decedent which might have been enforced by personal actions for the recovery of money ." *Wright v. Universal Tire, Inc*., 577 S.W.2d 194, 196 (Tenn. Ct. App. 1978). Such debt may be evidenced by a written instrument, a judgment, or affidavit. Tenn. Code Ann. § 30-2-307(b). Any affidavit must state that the claim is a correct, just and valid obligation of the estate of the decedent, and that no payment has been made thereon except as reflected on the claim. *Id*. The claim filed by Paula Saddler was based upon her sworn statement that it was a correct, just and valid obligation of the estate. As the trial court stated, she claimed "the estate owed her rent." It was her burden to establish that debt.

Ms. Saddler relies on the related theories of quantum meruit, unjust enrichment, and implied or quasi contract. Essentially, she asserts that Wayne Saddler received the benefit of staying rent-free in the house and that it would be inequitable or unjust for his estate to retain those benefits without compensation. Ms. Saddler concedes there was no express contract, written or oral, between herself and her uncle that he would pay rent.

On the other hand, the estate relies on legal principles governing recovery from an estate and argues that Ms. Saddler failed to establish an agreement that her uncle would pay her rent, a necessary element of a claim for services against the estate. It also asserts that Ms. Saddler gratuitously allowed her uncle to stay in the house out of affection and familial feelings. The estate also argues that Ms. Saddler failed to prove all the elements of quantum meruit, even if that theory applied herein.

Although each party staunchly and accurately argues the authority relevant to his or her theory, neither demonstrates how the two sets of principles can be reconciled in the context of a claim against the estate.

## A. CLAIMS AGAINST ESTATES

Claims against estates similar to the one before us are examined under principles that have been set out numerous times. Generally, cases in which a claimant seeks to recover for services provided to a decedent present one of two factual scenarios: the claimant has provided the services either (1) pursuant to an express or implied contract or (2) in hope or expectation of being rewarded in the decedent's will.[2] *Cobble v. McCamey*, 790 S.W.2d 279, 281-82 (Tenn. Ct. App. 1989). In the latter situation, the claimant generally cannot recover simply because his or her hope for generosity is disappointed. *Id*. at 282.[3] *See also Adams v. Underwood,* 470 S.W.2d 180, 182 (Tenn. 1971); *Owens v. Church,* 675 S.W.2d 178, 183 (Tenn. Ct. App. 1984); *Cotton v. Roberts' Estate,* 337 S.W.2d 776, 780 (Tenn. Ct. App. 1960).

With regard to a claim based on the first scenario, the claim necessarily is based upon a contract, including the required elements of offer and acceptance. *Cobble*, 790 S.W.2d at 281. Such a contract may be express or it may be implied in fact where there are circumstances that show a mutual intention to contract. *Id.*

> Therefore, if the plaintiffs establish that the decedent expressly or impliedly
> requested the services, and if plaintiffs prove that they rendered those services with

---

[2]Ms. Saddler testified in a proffer to statements by her brother Dwight in an attempt to show she held off asking her uncle for rent because her brother Dwight had told her not to because Uncle Wayne had willed her a portion of a farm. However, she does not pursue any argument that she let her uncle stay in her house for free in the expectation he would reward her in his will.

[3]     Where one renders services to another in the hope or expectation of a legacy, devise, or other provision by will for his benefit, without any contract, express or implied, but relying solely upon the generosity of the person for whom such services were rendered, he cannot recover for such services because of the failure of such person to make such testamentary provision in his behalf....

*Cobble,* 790 S.W.2d at 281, quoting *Brown v. Fuqua,* 9 Tenn. App. 22, 26 (1928).

the expectation that they were to be paid in some manner for those services, then a contract is made out against the estate for the reasonable value of those services.

*Id.*, at 282.

A contract implied in fact results from the circumstances of the case that show mutual assent to the terms, which must be sufficiently definite to be enforceable, consideration, and mutual intent to contract. *Givens v. Mulliken*, 75 S.W.3d 383, 407 (Tenn. 2002); *Angus v. City of Jackson*, 968 S.W.2d 804, 808 (Tenn. Ct. App. 1997). Ambiguous, vague, and indefinite statements by the parties to the alleged contract do not prove the necessary elements. *Cotton*, 337 S.W.2d at 779.

Whether the facts show a contract between the decedent and the claimant is influenced by another principle applied in such cases. When a close relative of a decedent provided a benefit to that decedent during his or her lifetime, there is a presumption that the benefit was provided gratuitously, out of motives of affection and duty towards that person; no obligation on the part of the recipient to make payment for the benefit arises.[4] *In re Conservatorship of Groves,* 109 S.W.3d 317, 356 (Tenn. Ct. App. 2003); *Cotton,* 337 S.W.2d at 780. Consequently, family members are often precluded from recovering benefits provided to a decedent because the law presumes such benefits were gratuitous. *Estate of Cleveland v. Gorden,* 837 S.W.2d 68, 71 (Tenn. Ct. App. 1992).

The presumption of a gratuitous benefit to a family member is not absolute, and can be overcome by the existence of an express contract between the parties. *Cobble,* 790 S.W.2d at 281; *Owens v. Church,* 675 S.W.2d 178 (Tenn. Ct. App. 1984). Another way to overcome the presumption is by showing "such exceptional facts and circumstances as will establish an intention on the one part to charge and on the other part to pay, notwithstanding the relationship of kinship." *Adams,* 470 S.W.2d at 185; *Cotton,* 337 S.W.2d at 780. In addition, the presumption can be rebutted by proof circumstances showing that the relative accepting the benefit knew or should have known that the relative providing it expected compensation or reimbursement. *Estate of Cleveland*, 837 S.W.2d at 71; *Gorrell v. Taylor*, 107 Tenn. 568, 570, 64 S.W. 888, 888 (Tenn. 1901).

The courts have also observed that the presumption is strongest when the relationship is between parent and child, and weaker when the relationship is more distant. *Cotton,* 337 S.W.2d at 780, quoting *Gorrell*, 64 S. W. at 888 (Tenn. 1901). Thus, it may be possible for a relative to

---

[4]A frequently quoted passage that explains the reasoning behind the presumption states:

> . . . family life abounds in acts of reciprocal kindness which tend to promote the comfort and convenience of the family, and ... the introduction of commercial considerations into the relations of persons so closely bound together would expel this spirit of mutual beneficence and to that extent mar the family unity.

*Key v. Harris*, 92 S. W. 235, 237 (Tenn. 1905).

obtain compensation for services to a decedent, but only if the factors set out above can be proved by evidence strong enough to overcome the presumption of gratuity.[5]

The trial court herein found that Ms. Saddler failed to prove she had an express or implied in fact contract with her uncle for him to rent the house she inherited. The evidence does not preponderate against that conclusion, but clearly supports it. Ms. Saddler does not claim otherwise. We also find that the proof does not establish that Wayne Saddler knew or should have known that Paula Saddler expected him to pay rent. She did not testify that she expected her uncle to pay her rent or that she conveyed that message or impression to him.

Accordingly, we conclude that Paula Saddler failed to prove the necessary requirements to sustain a claim against the estate for rents under principles generally applicable to such claims.

### B. QUANTUM MERUIT, UNJUST ENRICHMENT, QUASI CONTRACT, AND CONTRACTS IMPLIED IN LAW

Ms. Saddler maintains that she is entitled to recover unpaid rent from the estate because it would be unfair for her uncle, and therefore his estate, to keep the value of the benefit provided by her allowing her uncle to live in her house. The circumstances that she argues make it unfair are her own financial circumstances. The trial court agreed with this argument and found:

> . . . the claimant is entitled to recover not on the contract implied in fact but one implied in law as she furnished a benefit to Mr. Saddler and he received the benefit thereof. He accepted and appreciated the benefit thereof and it was inequitable for him to retain those benefits without payment for the value thereof. Alton Wayne Saddler recognized this obligation by paying one year of taxes and by stating on several occasions that he was going to pay claimant.[6]

Although Ms. Saddler primarily characterizes her claim as based on the theory of quantum meruit, it also includes elements associated with the related theories of unjust enrichment and quasi contract. With regard to these theories, our Supreme Court has stated:

> Actions brought upon theories of unjust enrichment, quasi contract, contracts implied in law, and quantum meruit are essentially the same. Courts frequently employ the

---

[5]Of course, the Dead Man's statute makes it difficult for any claimant to produce admissible evidence as to a decedent's understanding or intentions, in the absence of some sort of documentary proof. *Cantrell v. Estate of Cantrell,* 19 S.W.3d 842 (Tenn. Ct. App. 1999); *Burke v. Arnold*, 836 S.W.2d 99, 100 (Tenn. Ct. App. 1991); *Leffew v. Mayes,* 685 S.W.2d 288, 293 (Tenn. Ct. App. 1984).

[6]The trial court also found that during the time her uncle was living in her house, Paula Saddler paid rent on an apartment where she lived as well as on a storage building, paid taxes on the house, and was involved in expensive litigation.

-8-

various terminology interchangeably to describe that class of implied obligations where, on the basis of justice and equity, the law will impose a contractual relationship between the parties, regardless of their assent thereto.

*Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 154 (Tenn. 1966).

A contract implied in law is one created by law without the assent of the parties on the basis it is dictated by reason and justice. *Angus v. City of Jackson*, 968 S.W.2d 804, 808 (Tenn. Ct. App. 1998); *Weatherly v. American Agr. Chem. Co.*, 16 Tenn. App. 613, 65 S.W.2d 592 (1933). Courts may impose a contractual obligation, or contract implied in law, where one does not factually exist under various quasi-contractual theories, the primary one being unjust enrichment. *Whitehaven Community Baptist Church*, 973 S.W.2d 592, 596 (Tenn. 1998). The requirements for the imposition of a contract under that theory are (1) that no enforceable contract exists between the parties, and (2) the defendant will be unjustly enriched absent the imposition of a quasi-contractual obligation. *Id.*

The "most significant requirement for a recovery on quasi contract is that the enrichment be unjust." *Id.*, quoting *Paschall's, Inc.*, 407 S.W.2d at 155. The principle underlying the doctrine of unjust enrichment is that a party who receives a benefit he or she desires, under circumstances making it inequitable to retain that benefit without paying for it, must compensate the provider of the benefit. *CPB Management, Inc.*, 939 S.W.2d 78, 80; *Lawler v. Zapletal,* 679 S.W.2d 950, 955 (Tenn. Ct. App. 1984).

The elements that must be proved to establish a claim in the related theory of quantum meruit include the nonexistence of an enforceable contract, the provision and receipt of valuable goods and services, and circumstances that demonstrate that it would be unjust for the party benefitting from the goods or services to retain them without paying for them. *Castelli v. Lien*, 910 S.W.2d 420, 427 (Tenn. Ct. App. 1995). In addition, however, "the circumstances must indicate that the parties involved in the transaction should have reasonably understood that the person providing the goods or services expected to be compensated." *Id.*, citing *V.L. Nicholson Co. v. Transcon Inv. & Fin. Ltd.*, 595 S.W.2d 474, 482 (Tenn. 1980). Absent proof that the person providing the benefit expected compensation, a claim for quantum meruit must fail. *Estate of Queener v. Helton*, 119 S.W.3d 682, 688 (Tenn. Ct. App. 2003); *Estate of Atkinson v. Allied Fence & Improvement Co., Inc.*, 746 S.W.2d 709, 711 (Tenn. Ct. App. 1988).

As discussed earlier, Ms. Saddler failed to prove she expected her uncle to pay her rent and never demanded rent from him or made any such expectation known to him. Thus, she failed to prove circumstances indicating that she and her uncle should have reasonably understood that she expected to be compensated for allowing him to live in the house she inherited. This failure to prove unilateral, much less mutual, expectation results in a failure to prove all the elements of a claim in quantum meruit.

Where the theories of unjust enrichment and quasi contract intersect with the principles governing claims against estates, it is not entirely clear which principles predominate. Rather, it is the factual circumstances that determine the outcome. For example, in *Estate of Queener v. Helton*, 119 S.W.3d 688 (Tenn. Ct. App. 2003), this court considered claims filed by three different claimants asserting various legal bases.[7]

One of the claims was based on testimony that the claimant, a Ms. Kelley, unrelated to the decedent, along with her family moved into a house owned by decedent, made significant improvements to the house, and helped with gardens and cattle on the property for thirty years. The decedent's mother moved in with claimant's family, and claimant cared for her during the last years of her life. The proof showed that the claimant expected compensation for these services, the decedent had promised the house would be hers, and decedent had told people he was going to give the house to claimant because she had taken care of his mother. This court found these facts sufficient to support the claim under either a quantum meruit or implied contract theory. *Id*. 119 S.W.3d at 688. Although the court based its holding, in part, on its finding that it would be unjust not to compensate the claimant for her services, the court also stated that the claim was based on an express or implied contract theory. The facts establish a contract implied in fact.

The holding herein must stand, if at all, on the ground stated by the trial court, *i.e.*, unjust enrichment. The question of whether Wayne Saddler was unjustly enriched by being allowed to continue living rent-free in the home he had shared with his brother must be analyzed in view of the entire situation and with due consideration to the family member gratuity presumption. We find significant the fact that Paula Saddler never asked her uncle to pay her rent. Although she had the power to end the situation if she thought it unfair or unduly burdensome, she allowed it to continue for over four years, during which time she never asked for rent and never expressed to anyone that she expected her uncle to pay her rent.

There is no testimony that Wayne Saddler ever spoke of paying regular rent. The proof shows only that on several occasions he expressed a sensitivity to his niece's financial situation and a general willingness to give her financial assistance. There was apparently a reluctance by Ms. Saddler, shared by other family members, to upset or disrupt Wayne Saddler by directly confronting him with a choice of paying rent or moving. These concerns are typical of the type that influence family members' conduct toward one another. We cannot say that such accommodation is unfair or unjust.

Accordingly, we conclude that the claimant, Paula Saddler, has failed to prove she is entitled to 51 months of rent on the basis of quasi contract or unjust enrichment.

---

[7]One of those bases was the equitable doctrine of resulting trust. A resulting trust is implied by law from the conduct and will be decreed to prevent unjust enrichment or a failure of justice. *In re Estate of Nichols*, 856 S.W.2d 397, 401 (Tenn. 1993). Another claim was based on the theory of constructive trust, which requires a showing that a person has acquired property through inequitable means and, in equity, should not hold or enjoy it. *Roach v. Renfro*, 989 S.W.2d 335, 341 (Tenn. Ct. App. 1998). This court found the proof did not show circumstances necessary to establish either a resulting trust or a constructive trust.

## V. Conclusion

We reverse the judgment of the trial court. This case is remanded to the Chancery Court of DeKalb County for any further proceedings that may be necessary. Tax the costs on appeal to the appellee, Paula Saddler.

_____

PATRICIA J. COTTRELL, JUDGE