IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 3, 2004 Session

**IN RE ESTATE OF LEVESTA MEASLES, DECEASED**

**An Appeal from the Chancery (Probate) Court for Warren County
No. 1501-P     Larry B. Stanley, Jr., Chancellor**

––––––––––––––

**No. M2004-00244-COA-R3-CV - Filed June 27, 2005**

––––––––––––––

This is a claim against an estate for personal services rendered to the decedent.  The decedent's stepson and his wife provided personal services to the decedent for several years prior to her death.  The decedent died intestate, leaving no issue.  The decedent's nephew was appointed as administrator of the decedent's estate.  The stepson and his wife filed claims against the estate on the theory of implied or quasi contract, seeking reimbursement for the expenses incurred in providing the personal services for the decedent.  The decedent's estate filed an exception to those claims.  After a hearing, the trial court granted a portion of the stepson's and his wife's claims for personal services, finding that an implied contract existed with the decedent as to those items.  The estate now appeals.  We reverse, finding that the evidence preponderates against the trial court's finding of an implied contract between the decedent and the claimants that the claimants would be paid for their services at the time the services were rendered.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Jennifer Austin Mitchell, Dunlap, Tennessee, for the appellant, Estate of Levesta Measles.

Dale Bohannon, Cookeville, Tennessee, for the appellees, Lee Roy Shofner and Josie Shofner.

**OPINION**

In 1936, the decedent, Levesta Measles ("Decedent"), married Powell Measles ("Mr. Measles").  At the time they were married, Mr. Measles had a son, Claimant/Appellee Lee Roy Shofner ("Stepson"), the stepson of the Decedent.  Mr. Measles died in 1985.  After Mr. Measles died, the Decedent continued to live in McMinnville, Tennessee.  Stepson was later given power of attorney for Decedent, and his name was added to her bank accounts and a certificate of deposit.

In 1989, the Decedent suffered a stroke. Thereafter, she had several mini-strokes, and consequently her health gradually worsened. Beginning sometime in 1996, the Decedent began receiving assistance from Stepson and his wife Claimant/Appellee Josie Shofner ("Wife"), whose home was in Knoxville, Tennessee. The Decedent spent between three and four months per year with Stepson and Wife, and they assisted her with medical appointments and provided her food, clothing, and personal items.

In February 2001, the Decedent was hospitalized after she suffered another very debilitating stroke. After this stroke, she was never again able to talk. In March 2001, when Decedent was released from the hospital, she was placed in a nursing home in Pigeon Forge, near Knoxville, where she stayed for the remainder of her life. When the Decedent was placed in the nursing home, she signed over a $22,428.04 certificate of deposit ("CD") to Stepson. Stepson cashed the CD and placed the proceeds into his personal bank account. On January 11, 2002, the Decedent died at the age of eighty-four, intestate and without issue.

On September 19, 2002, Willard Jones, the nephew of the Decedent, filed a petition to probate the Decedent's estate ("Estate"). The petition requested that Jones be confirmed as the administrator of the Estate. Jones asserted that he and his two sisters were the living heirs of the Decedent. The petition stated that the value of the Decedent's remaining personal property was estimated at less than $20,000, and that the value of her real property was estimated at $53,000. On the same day, the trial court entered an "Order for Issuance of Letters of Administration," granting the petition and appointing Jones (hereinafter "Administrator") as the Administrator of the Estate.[1]

On January 21, 2003, Stepson and Wife each filed separate but identical claims against the Estate in the amount of $32,050.67. Of this total amount, $6,380 was for funeral expenses, $1,920 was for cable television charges, and $23,750 was for personal services and other expenditures incurred on behalf of the Decedent. On February 20, 2003, the Estate filed exceptions to both claims. Later, Wife withdrew her claims for funeral expenses and cable television charges, because Stepson had paid for those claims. Her claim for personal services remained intact.

On July 22, 2003, the trial court held a hearing on the claims filed by Stepson and Wife.[2] The trial court heard testimony from several witnesses, including Stepson and Wife.

In his testimony, Stepson gave some background. He said that, when his father married the Decedent, they lived in Indiana for a long period of time, and Stepson stayed in Tennessee with his grandmother. By the time Mr. Measles and the Decedent moved back to Tennessee, Stepson had three children. Stepson said that Mr. Measles and the Decedent visited Stepson and his family

---

[1] The order was entered on September 19 and filed on September 20, 2002.

[2] In addition, the trial court considered motions filed by the Estate requesting the return of personal property from Stepson and a motion to sell the Decedent's real property. The resolution of those motions is not at issue on this appeal.

regularly and that they all had "a good relationship." After Mr. Measles died, Stepson was given power of attorney for the Decedent, and he was added to her bank accounts and put on her CD.

After the Decedent suffered the debilitating stroke in 1989, Stepson testified, she never completely recovered. Although her health was "pretty good" for about ten years thereafter, the Decedent continued to have "mini-strokes," and her condition gradually worsened. Stepson said that, after the stroke, he took care of the Decedent. After Stepson married Wife in 1996, they both took care of the Decedent. Stepson and Wife lived in Knoxville, while the Decedent continued to live in McMinnville. Stepson said that the Decedent had to travel to Knoxville often for health related issues, such as to get glasses, to have dental work done, or to undergo medical tests, and when she did so, she stayed with Stepson and Wife. Between 1996 and the time of the Decedent's 2001 stroke, Stepson stated, the Decedent spent an average of four to eight months per year with him and Wife. In his testimony, Stepson recounted several different incidents that required the Decedent to stay with him and Wife for prolonged periods of time. In 1997, the Decedent was hospitalized in Knoxville for three weeks because of a negative reaction to a medication. When she was released, she stayed with Stepson and Wife for about three months. In 1999, the Decedent had cataracts removed from her eyes, and stayed with Stepson and Wife for several weeks. Also in 1999, the Decedent stayed with them when she was diagnosed with a slow-growing cancer; treatment was not recommended because of the Decedent's frail health. The Decedent also stayed with them in 2000 after she fell off of her bed and cracked some ribs. During the time the Decedent stayed with them, Stepson said, they took the Decedent to doctor appointments and made sure that she had her baths, food, and proper medication. In the year preceding the Decedent's 2001 stroke, Stepson and Wife had to help the Decedent get out of bed in the morning because she could not get up by herself. Stepson said that Wife helped the Decedent with baths and other personal needs. On cross-examination, Stepson agreed that he loved the Decedent like his own mother, that they had a trusting, family-type relationship, and that he wanted to take care of her. Stepson testified that, after the Decedent was placed in the nursing home after her 2001 stroke, he and Wife visited the Decedent almost every day and fed her one meal each day to ensure that she got proper care.

In his testimony, Stepson calculated that, over a five-year period, the Decedent stayed in his home approximately 950 days and, if his and Wife's services were valued at $25 per day, their services to the Decedent were worth $23,750. Stepson acknowledged that he cashed out the Decedent's $22,000 CD when she moved into the nursing home and put the funds in his own bank account. He explained, however, that the Decedent had no medical insurance, and that the proceeds from the CD were used to pay her medical bills. Stepson said that Social Security and Medicaid/Medicare paid for about three months of the Decedent's nursing home expenses, and that he filed the claims for the Medicare benefits.[3] He said that Medicare did not pay the full nursing home expense, and asserted that he used the proceeds of the CD to pay the difference between the cost of the nursing home and the amount that Medicare paid.

---

[3]The Bureau of TennCare, Department of Finance and Administration, filed a claim against the estate of the decedent in the amount of $19,969.57 for her care in the nursing home from March 2, 2001 through January 9, 2002.

Stepson testified that he paid the Decedent's funeral expenses, totaling $6,190.65, from his own funds. He also said that he paid her cable television bill, approximately $30 per month, from 1989 through February 2002. Stepson claimed that the only way the Decedent would allow him to pay for her cable television was if he agreed to be reimbursed by her estate when she died. On cross-examination, Stepson acknowledged that the Decedent twice had her cable television canceled, but he claimed that she did so because she did not want him to have to pay for it.

The Decedent's long-time neighbor and friend, Sandra Jones ("Jones"), testified on behalf of Stepson and Wife. Jones testified that she had known the Decedent since she moved into her house in McMinnville in the early 1970s and said that she talked to her every day and knew her "better than anybody in McMinnville." Jones said that, since 1996, the Decedent stayed with Stepson and Wife at their home in Knoxville "quite often," sometimes for one, two, or three months at a time. Jones explained that the Decedent went to Knoxville on Christmas, birthdays, and when she needed to see one of her physicians. She said that the Decedent loved Stepson "as if he were her own blood," and that she "was crazy about [Wife]. [Wife] was very good to her." When asked what services Stepson and Wife provided for the Decedent, Jones said that Stepson paid her television cable bills, and that the Decedent had told her that she wanted him to be reimbursed for those bills. She said that the Decedent "wanted [Stepson] to have all that she had to begin with. It was my understanding from day one, [Stepson] was to have everything that she had. He was going to take care of her. He promised Mr. Measles that he would take care of her." Jones said she came to have that understanding because the Decedent had told her this "many, many times."

On cross-examination, counsel for the Estate showed Jones a copy of a Last Will and Testament and Codicil purportedly signed by the Decedent. The purported will had not been entered into probate. In that purported will, the Decedent left her property to Stepson's three children, but not to Stepson or Wife.[4] Jones said that she was familiar with the Decedent's handwriting, and that the signatures on the will and codicil were not those of the Decedent.

Another long-time friend of the Decedent, Grace Ward ("Ward"), also testified at trial. Ward said that she had known the Decedent for thirty years, and had attended the same church with her for about fifteen years. Ward said that she and the Decedent were "very close," and that they visited each other's homes. She testified that Stepson and Wife "were there for [the Decedent] when she was sick and needed help," and that they took the Decedent to their home for a month or two at a time. She said that Stepson and Wife bought the Decedent new clothes and paid her cable television bill. Ward said that the Decedent "always wanted to pay [Stepson] back for everything he did." She claimed that the Decedent had changed her Last Will and Testament and "made it to [Stepson] and his family," and that the Decedent said to her, "[Stepson] will be tak[ing] care of me." According to Ward, the Decedent told her, " '[Stepson] promised my husband, Mr. Powell Measles, that he would care of me,['] that was just a little while before Mr. Measles passed away, and said 'I want

---

[4]A Complaint and Petition to Probate the Last Will and Testament of the decedent was filed in the trial court in an attempt to probate a document purporting to be the decedent's Last Will and Testament and Codicil. The petition was contested and, for reasons that are unclear from the record, was voluntarily dismissed.

him to have what I've got.' " Ward conceded that she did not see the Decedent's revised will, but asserted that the Decedent told her, "I have changed the Will and that way I know [Stepson] will get reimbursed." Although the Decedent ostensibly told Ward that the will would be in a tin box under her bed, no will fitting that description was found. On cross-examination, counsel for the Estate showed Ward a copy of the purported Last Will and Testament and Codicil that left all of the Decedent's property to Stepson's three children, but not to Stepson and Wife. Ward said that she was not aware of that will.

Wife testified as well. She corroborated Stepson's testimony regarding the frequency and duration of the Decedent's stays in their home. During the five years prior to the Decedent's move to a nursing home, Wife helped the Decedent with her physical therapy, and her speech therapy, and generally "whatever she needed." Wife said that she helped the Decedent with bathing, dressing, and taking her medicine. When the Decedent stayed with Wife and Stepson, Wife prepared three meals a day for her. Once the Decedent moved to the nursing home, Wife said, she and Stepson went to the nursing home every day to visit and feed her. During this time, they also paid for the Decedent's clothes and personal items.

Stepson's daughter, Carol Shofner Preston ("Preston"), testified on behalf of the Estate. Preston said she had not seen her father since October of 2000. In contrast to the testimony of Stepson and Wife, Preston claimed that she oversaw the Decedent's medical care, ordered her prescription medication, and made sure that she went to the doctor. Preston asserted that she was the one who usually took the Decedent to her doctor appointments. She acknowledged that, about eighteen months before the Decedent's debilitating 2001 stroke, Stepson, her father, took over the medical care of the Decedent. Preston was unsure about what Stepson did for the Decedent. She conceded that the Decedent stayed with Stepson and Wife when she went to Knoxville, but claimed that the Decedent also spent a part of each visit with Preston and her husband. Preston said that the Decedent visited in Knoxville three or four times a year, and would stay for four to six weeks each visit. She recalled that the Decedent would typically visit Knoxville for Thanksgiving, Christmas, her birthday, and one week during the summer. Over time, the visits became longer, and after one of her mini-strokes, the Decedent extended her stay to at least four months. Counsel for the Estate showed Preston the Decedent's purported will and codicil devising her personal property to Preston and her two brothers, one of whom was deceased. Preston asserted that she was aware that the Decedent had left a will, and recognized the will presented as that of the Decedent. Preston testified that she visited the Decedent in the nursing home and at least two or three times a month, and on those occasions fed her supper. She claimed that, when she visited, she never saw Stepson or Wife there, and disputed the testimony of Stepson and Wife that they fed the Decedent every night. Preston said that it was "[a]bsolutely untrue" that Stepson and Wife met all of the Decedent's medical needs, and asserted that she bought the Decedent most of her clothes. As for the cable television, Preston said that her whole family gave the Decedent monthly cable television as a gift after they discovered that the Decedent had cancer. She said that the Decedent's cable television was a running joke with the family, because the Decedent would have never paid for it herself, and she even had it disconnected on more than one occasion. Preston said that the family would outsmart the Decedent by having the cable television bill sent to Knoxville, then Stepson would write one

check to cover several payments in advance. When the Decedent had her cable television turned off, Stepson would call and have it turned back on.

The Administrator's wife, Wilma Jones ("Jones"), also testified on behalf of The Estate. Jones said that sometimes she visited the Decedent several times a week, although there were occasions on which she did not visit for two or three weeks. Jones stated that the Decedent usually visited Stepson and Wife on holidays, and that she did not remember a time when the Decedent stayed with Stepson and Wife two to three months at a time.

At the conclusion of the hearing, the trial court granted in part and denied in part the claims filed by Stepson and Wife. The trial court found that the familial relationship between the Decedent and the claimants, Stepson and Wife, created a presumption that the services provided were gratuitous. It concluded, however, that Stepson and Wife overcame that presumption and had proved that a quasi contract or implied contract existed between themselves and the Decedent. On this basis, the trial court granted their claim for personal services rendered. It found that the value of their services to the Decedent was less than they claimed, and determined that reasonable compensation for those services was $10,500, based on a finding that Stepson and Wife had cared for the Decedent for three and one-half months per year over a period of four years, or 420 days, at a value of $25 per day. The trial court also granted Stepson's claim for out-of-pocket funeral expenses, finding that claim to be valid. The trial court denied the claim for cable television expenses because "there was no real thought of repayment" for that expense. On September 30, 2003, the trial court entered an order consistent with its oral ruling. From that order, the Estate now appeals.

On appeal, the Estate challenges only that portion of the trial court's decision granting the claim of Stepson and Wife for the value of personal services rendered to the Decedent. The Estate argues that the preponderance of the evidence does not support the trial court's conclusion that an implied or quasi contract existed between the Decedent and claimants Stepson and Wife. The Estate asserts that the evidence shows that the Decedent requested a favor from Stepson, and that there was no evidence that she intended to pay them for their services. Furthermore, the Estate argues, the closeness of the relationship between the parties triggered the presumption of gratuitous services, and the presumption was not overcome by the evidence presented at trial. The Estate points out that neither Stepson nor Wife testified that they expected to be paid for their services to the Decedent. On the contrary, they claim, Stepson testified that he performed the services for the decedent out of love for her. Allowing hearsay testimony from Jones and Ward, the Estate argues, was clearly erroneous because there was no applicable exception to the hearsay rule, and because the testimony violated the "Dead Man's" statute. Therefore, the Estate maintains, the decision of the trial court should be reversed.

The trial court's decision must be reviewed *de novo*, presuming the trial court's findings of fact to be correct unless the preponderance of the evidence is otherwise. *In re Estate of Vires*, No. W2000-02953-COA-R3-CV, 2002 WL 1760502, at *2 (Tenn. Ct. App. Apr. 10, 2002). Conclusions of law are reviewed *de novo*, with no such presumption of correctness. *See State v. Levandowski*,

955 S.W.2d 603, 604 (Tenn. 1997); ***Ridings v. Ralph M. Parsons Co.,*** 914 S.W.2d 79, 80 (Tenn. 1996).

"In asserting a claim against an estate for services rendered the decedent, the cause of action necessarily is based upon either contract or quasi contract." ***Cobble v. McCamey***, 790 S.W.2d 279, 281 (Tenn. Ct. App. 1989) (quoting trial court opinion); ***Cotton v. Estate of Roberts***, 337 S.W.2d 776, 780 (Tenn. Ct. App. 1960). In order to prove the existence of such a contract, the claimant must show that there was an offer and an acceptance of that offer, which may be expressed or implied from the parties' conduct. ***Cobble***, 790 S.W.2d at 281 (quoting trial court opinion). "Therefore, *if* the plaintiffs establish that the decedent expressly or impliedly requested the services, *and if* the plaintiffs prove that they rendered those services with the expectation that they were to be paid in some manner for those services, then a contract is made out entitling the plaintiffs to recover against the estate for the reasonable value of those services." ***Id.*** at 282; ***see also Hughes v. Estate of Haynes (In re Estate of Haynes)***, No. M2002-01896-COA-R3-CV, 2003 WL 22056011, at *3 (Tenn. Ct. App. Sept. 4, 2003). The issue is whether the claimants expected payment for the services at the time the services were rendered. ***Hughes***, 2003 WL 22056011, at *4. "If the request is for a favor, and the services are rendered on that basis, there is no contract. Likewise, if the services are rendered with no intention at the time of rendition to charge therefor, and are accepted on that basis, there is no contract." ***Cotton***, 337 S.W.2d 779-80. When one family member renders services to another family member, a presumption arises that those services were "rendered gratuitously, from motives of affection and duty." ***Id.*** at 780. The presumption "grows weaker as the relationship recedes." In order to overcome the presumption, the claimant must establish "an expressed contract or such exceptional facts and circumstances as will establish an intention on the one part to charge and on the other part to pay, notwithstanding the relation of kinship." ***Id.***

In this case, the trial court concluded that the petitioners had a relationship with the Decedent that raised the presumption that the services provided by them were gratuitous. The trial court concluded, however, that there was sufficient evidence of a quasi contract to overcome that presumption. The trial court reasoned:

> [T]he claimant does have some relationship and that created a presumption that the services were rendered gratuitously to the decedent, for reasons that we talked about, affection, and the closer [the relationship] the stronger that presumption is, whether it's by marriage or by blood. The decedent, Mrs. Measles, could have saved herself if she intended to give [to] these people. I think she intended for them to have something whether it was just being able to take care of her money and take a little bit out of that, I believe that she wanted them to have something. I wish she'd changed her Will and made it much clearer. . . . I find that there was a quasi-contract or an implied contract that the claimants' have proved, have met the burden of proof in showing that there was the intention to provide for them and the expectation on their behalf that some compensation would be given. . . . I think the presumption has been overcome that they rendered services [gratuitously] for this lady.

-7-

Thus, because the Decedent expected to compensate Stepson and Wife, and Stepson and Wife expected some compensation, the trial court determined that an implied or quasi contract existed.

At trial, the testimony of Stepson, Wife, Ward, and Jones supported the trial court's finding that Stepson and Wife had, indeed, performed personal services for the Decedent when she visited them in Knoxville for about fourteen weeks each year. Even Preston, who testified for the Estate, acknowledged that the Decedent stayed in the home of Stepson and Wife when she visited Knoxville three or four times a year, for four to six weeks each visit, and that Stepson took over the Decedent's medical care during the last eighteen months before she moved into the nursing home.

Evidence showing that the Decedent and the claimants had an implied contract or quasi contract for the performance of services, however, is not as substantial. As noted above, the claimants must prove (1) that the Decedent expressly or impliedly requested the services, and (2) that Stepson and Wife performed those services with the expectation that they were to be paid in some manner at the time the services were rendered, during the Decedent's life. **Hughes**, 2003 WL 22056011, at *3, *4. "If the services were rendered in the hope or expectation of some provision in [the decedent's] will, and without any other contract for payment, there can be no recovery because of the failure of such testamentary provision." **Id.** at *5.

In **Hughes**, **supra**, the claimants were husband and wife and were unrelated by blood or marriage to the decedent. They filed an action against the decedent's estate to recover compensation for personal services rendered to the decedent for several years prior to her death. Attached to their claim was a statement written by the decedent stating that, "[a]fter I am gone I want [the claimants] to be paid $150,000 for all the things you have done for me over the years and haven't been paid for." **Id.** at *1. It was undisputed that this statement satisfied neither the requirements for a will codicil or for an express contract. However, based on the decedent's intent as expressed in the statement, the trial court awarded the claimants $75,000 for their services.[5] **Id.** at *2. The estate appealed. On appeal, this Court determined that there was "ample" evidence to support a finding that the claimed services had been rendered and that those services had been requested. However, the appellate court concluded that there was insufficient evidence to show that the claimants expected payment from the decedent at the time the services were rendered. **Id.** at *4-*5. The record showed that the decedent was very independent, paid her bills in a timely manner, and that the claimants had received payment for some of their services at the time the services were rendered. Under these circumstances, the appellate court concluded, the decedent's handwritten statement requesting that the claimants be paid "after" her death for services that they "haven't been paid for," showed testamentary intent, not an intent to contract. However, the decedent did not leave a proper testamentary provision in her Will or in a codicil. Thus, the appellate court concluded the claimants were not entitled to recover on a theory of implied contract.

---

[5]The amount awarded was based on the testimony of the claimants that the value of their services was between $75,000 and $85,000. **Hughes**, 2003 WL 22056011, at *1-*2.

As in **Hughes**, the record in this case supports a finding that the Decedent requested, through Mr. Measles and otherwise, that Stepson "take care of" the Decedent. However, the evidence does not support a finding that the claimants expected to be paid for their services to the Decedent at the time they rendered such services. To the contrary, neither Stepson nor Wife testified that they expected to be paid for their services, and Stepson testified that he loved the Decedent like his own mother and wanted to take care of her. The claimants mainly rely on the testimony of Ward and Jones to establish the Decedent's intent to "reimburse" the claimants for the services they provided to her over the years. Jones testified that the Decedent told her that Stepson had promised Mr. Measles to "take care of" the Decedent, and that Stepson was to "have everything that she had." Ward testified that the Decedent told her that she was going to change her Last Will and Testament so that she would know that Stepson would be reimbursed, although no such will was found. Rather than establishing the existence of a contract for payment at the time the services were rendered, this testimony establishes the Decedent's intention to include the claimants in her Last Will and Testament so that they would recover payment from her estate, to the extent that the estate would be able to pay, for the expenses related to her care. Indeed, the trial court appeared to implicitly recognize the Decedent's testamentary intent when it commented, "I wish she'd changed her Will and made it much clearer." Thus, based on the record before us, we must conclude that the evidence preponderates against the trial court's finding that the parties entered into an implied or quasi contract, and preponderates in favor of a finding that the Decedent intended, but failed, to include the claimants in her Will. "[W]ithout any other contract for payment, there can be no recovery because of the failure of such testamentary provision." **Id.** at *5. Therefore, the award of $10,500 to the claimants for services rendered to the Decedent must be reversed. All other issues raised in this appeal are pretermitted.[6]

The decision of the trial court is reversed. Costs on appeal are to be taxed to Appellees Lee Roy Shofner and Josie Shofner, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[6]We need not address the issue of whether the relationship between the claimants and the Decedent raises a presumption of gratuitous services.